**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Robert E. CLEVELAND, Defendant-
Appellant.**

No. 73-1679.

United States Court of Appeals,
Seventh Circuit.

Argued Dec. 7, 1973.

Decided Oct. 24, 1974.

Rehearing Denied Dec. 11, 1974.

732

Joseph A. Lamendella, Chicago, Ill., for defendant-appellant.

James R. Thompson, U. S. Atty., Gary L. Starkman and Ann P. Sheldon, Asst. U. S. Attys., Chicago, Ill., for plaintiff-appellee.

Before SWYGERT, Chief Judge, SPRECHER, Circuit Judge, and CAMPBELL, Senior District Judge.*

WILLIAM J. CAMPBELL, Senior District Judge.

Defendant Robert E. Cleveland was convicted on each count of a three count indictment charging tax evasion in violation of 26 U.S.C. § 7201. On appeal (Cleveland I), this court held that the district judge, in understandable reliance upon the language of United States v. Keig, 334 F.2d 823, 825 (7th Cir. 1964), had erroneously concluded that the Special Agent's Report (SAR) was not a "statement" producible under the provisions of the Jencks Act, 18 U.S.C. § 3500. Stating that "[w]e . . . expressly disapprove of the language of that [Keig] opinion insofar as it may be read to imply that a Special Agent's Report is not a statement within subsec-

tion (e) [of § 3500]," 477 F.2d at 316, this court vacated the judgment of conviction and remanded the case with directions that the trial judge conduct an *in camera* inspection of the SAR to determine whether the content of that statement "relates to the subject matter as to which the witness has testified." 18 U.S.C. § 3500(b). The district court was directed to enter a fresh judgment of conviction if it determined that "no part of the report need be produced." 477 F.2d at 316. On the other hand, if any portion of the report was found to relate to the subject matter of the witness' testimony, the defendant was to be granted a new trial, unless "it is perfectly clear that the defense was not prejudiced" by the government's failure to tender "3500 material" upon request. 477 F.2d at 316, n. 9.

On remand, a hearing was held at which Special Agent Carey[1] testified regarding the nature and composition of the multi-volume report, and the district judge conducted a general *in camera* inspection of the documents contained therein. Subsequently, the court entered a fresh judgment of conviction, holding that certain portions of the report did not relate to the witness' direct testimony or were outside the scope of the defendant's § 3500 request, and that the remaining documents were either reviewed by the defendant prior to trial or were summaries and partial duplications of such documents. With respect to the latter, the court held that it was perfectly clear that the defendant had not been prejudiced by the fact that they were not produced in response to his motion. We reverse.

I.

The district court's order discloses that, for the purposes of the remand proceedings, the SAR was subdivided into four exhibits, designated Government's Exhibits One, Two, Three and

* Senior District Judge William J. Campbell of the Northern District of Illinois is sitting by designation.

[1]. Agent Carey prepared the SAR in the course of his investigation and testified at the trial on behalf of the government.

Four (hereafter, GX-1, 2, 3 and 4). GX-1 comprises Volume One of the SAR. GX-2 contains those documents taken from Volumes Two through Ten of the SAR which had been used as exhibits during the trial. GX-3 consists of those exhibits and memoranda of interview taken from Volumes Two through Ten of the SAR which were not introduced into evidence during the trial. Finally, GX-4 is a group of index cards listing defendant's clients, their addresses and other data.

The district court found that all documents introduced into evidence in the course of the trial (GX-2) were reviewed by the defendant prior to trial. Apparently, the index cards (GX-4) were also made available to the defense before trial. Although the district court did not specifically determine whether these documents related to the agent's direct testimony, the district judge did conclude that it was perfectly clear that defendant had suffered no prejudice, since he had an opportunity to review, and in fact did review, these materials on an earlier occasion.

■ For the reasons and in the respects stated in Part II of this opinion, we hold that such materials do relate to the direct testimony of a witness such as Agent Carey. The district court's failure to specifically so find, however, is without consequence, since we agree that defendant's review of these materials prior to trial establishes clearly that he was not prejudiced by the fact that they were not tendered in response to his motion.[2]

GX-3, constituting those portions of Volumes Two through Ten which were not introduced into evidence, was found by the district court upon "general inspection" to consist of "memoranda of interview of the defendant, his personal representative and his former wife, summary schedules of certain exhibits, the originals of which were introduced into evidence, certain affidavits, the contents of which were stipulated to during the trial, [and] documents in support of the computations of the defendant's additional civil tax liability."

With respect to these materials, the district court held as follows:

"The only items in Government's Exhibit Three which were not made available to the defendant prior to trial were the memoranda of interview of defendant's former wife and his personal representative and the documents in support of the summary computations pertaining to defendant's civil tax liability. Defense counsel specifically excluded interviews with third parties from the scope of his 3500 request. Furthermore, the court finds that the memoranda of interview and civil tax liability documents did not relate to the subject matter about which the witness testified."

Again, regarding materials contained in GX-3 which the defendant reviewed prior to trial, the district court did not specifically determine whether these documents related to the agent's direct testimony. However, as in the case of GX-2, we agree with the district court's implicit determination that the defendant was certainly not prejudiced by their nondisclosure at trial, since they were reviewed by the defense prior to trial.

■ We must disagree, however, with the finding that "[d]efense counsel specifically excluded interviews with third parties from the scope of his 3500 request." Although the trial transcript does contain some support for this position,[3] defendant's original request

---

2. We do not suggest, nor should *Cleveland 1* be viewed as intimating, that the government has the option to purposely withhold relevant materials which are properly requested under 18 U.S.C. § 3500 on the ground that

the defendant will not be prejudiced by their nondisclosure.

3. After Agent Carey had taken the stand, defense counsel reminded the court that the

for the production of the SAR did not exclude memoranda of interviews with all third parties. In the course of presenting the § 3500 motion, defense counsel stated:

> "I would call for the production of the Special Agent's report as a 3500 Statement. I do not want that portion of the report that contains exhibits and interviews with third party *witnesses*, I only want that which is related to the testimony of the Special Agent in this case." (Tr. Transcript, p. 3 emphasis added).

In response to the government's objection, the court stated "I will not require you [the government] to do it." Thus, the request which resulted in the district court's adverse ruling was a request for the documents contained in the SAR, other than interviews with third party *witnesses*. Memoranda pertaining to interviews with other third parties were included among the documents requested.

With respect to Volume One of the SAR (GX-1), the district court held that:

> "the administrative review portions of that volume, together with the summary schedules pertaining to the defendant's civil tax liability, do not relate to the subject matter as to which the witness has testified. The remaining portion of this volume is merely a summary or partial duplication of the items contained in Volumes Two through Ten . . . ."

After reviewing Volume One and those portions of GX-3 which the defense did not review prior to trial, we hold that the district judge's findings regarding Volume One, as well as his determination that portions of GX-3 do not relate to the witness' direct testimony, were clearly erroneous.

Special Agent Carey testified that, in the course of his official duties, he conducted an investigation concerning Robert E. Cleveland, the purpose of which was to "determine the accuracy of the income tax returns filed for the years 1964, 1965 and 1966;[4] that he computed defendant's income tax for those years, as well as for 1961, 1962, and 1963, using the net worth and expenditure method;[5] and that his investigation started in 1966 and continued "to the beginning of these proceedings."[6] He was permitted to testify regarding determinations made by him in the course of his investigation,[7] and identified Government's Exhibit 100 as a net worth schedule which "reflects generally the results of the investigation I conducted."[8]

Among other things, Agent Carey testified regarding (1) the employment status of defendant's former wife before and during their marriage; (2) defendant's business income; (3) ownership by defendant of specifically identified securities; (4) accounts maintained by defendant in various brokerage firms; (5) defendant's membership on the Chicago Board of Trade; (6) defendant's indebtedness resulting from commodities trading and a judgment entered against defendant as a result thereof; (7) assets which allegedly remained in the possession of defendant's former wife prior to divorce proceedings; (8) defendant's real estate holdings; (9) his saving accounts; (10) automobiles owned at various times by defendant; (11) accounts held in the names of others, in which defendant allegedly had an interest; (12)

SAR had previously been requested as a 3500 statement. The following colloquy then occurred:

> "THE COURT: I don't understand how the full report . . . .
>
> MR. LAMENDELLA: I am only saying that part of the report, your Honor, which relates to the subject matter of his testimony, not his recommendation for prosecution, not his exhibits, not his interviews with third parties." Tr. Transcript. p. 134.

4. Tr. transcript. pp. 41, 42
5. Tr. transcript, pp. 42, 43
6. Tr. transcript, p. 46
7. Tr. transcript, p. 63
8. Tr. transcript, p. 61

nontaxable income and sources thereof; (13) debts paid to Cleveland by various clients; (14) identification of exhibits relating to assets, liabilities and expenditures attributed to defendant; (15) various loan applications prepared by the taxpayer.

A comparison of the Carey testimony with those documents which were not reviewed by defense counsel prior to trial refutes the district court's conclusion that they are not sufficiently related to one another to warrant production under the Jencks Act. For example among the documents included in GX-3 which defense counsel was not allowed to review prior to trial are transcripts and memoranda pertaining to interviews with defendant's former wife. Presumably relied upon by Agent Carey to assist in his determination of defendant's assets, liabilities and expenditures for the purpose of ascertaining defendant's net worth, the information contained in these documents includes references to assets allegedly owned by Mrs. Cleveland prior to the marriage, the sources of certain funds held during the marriage in her name, expenditures of funds for rent, food, entertainment and alimony (paid to defendant's first wife), the purchase price of their home and an apartment building, and other asset and liability information highly pertinent to a determination of defendant's net worth. The memorandum of interview prepared by Agent Carey also contains information relevant to the credibility of defendant's former wife, and would no doubt have been of assistance to defense counsel in challenging the validity of the information relied upon by the agent in reaching his conclusions as to defendant's net worth.

We similarly disagree with the district court's conclusion that those portions of the SAR which pertain to civil tax liability are unrelated to the subject matter of the agent's testimony. The testimony of Agent Carey was central to the government's case, since it was the long arduous investigation of this witness which formed the basis for the government's contention that defendant had understated his income in 1964, 1965 and 1966, and had thereby evaded the payment of income taxes. As the Second Circuit stated in United States v. O'Connor, 273 F.2d 358 (1959):

> "In this setting, it is quite plain that the agents' reports relating to O'Connor's asset, income and expenditure position during the entire tax period in question, *whether prepared for criminal or civil tax purposes,* were necessary to defendant's preparation and conduct of his defense in two respects, to determine whether any statements of fact therein were inconsistent with or contradictory to testimony on the stand of the makers of the reports, and to test their expertness in preparation of the charts and computations used by them respectively on the stand" (emphasis added). 273 F.2d at 360.

Since the information which formed the basis for civil tax liability schedules was obtained by the agent in the course of his investigation, and since the nature and result of that investigation constituted the substance of this witness' direct testimony, we conclude that these documents were sufficiently related to the witness' testimony to warrant production under the Jencks Act.

Turning to Volume One of the SAR (GX-1) the district court held that the "remaining portion of this volume" is merely a summary or partial duplication of information contained in Volumes Two through Ten. Included among this "remaining portion" are reports prepared by Agent Carey dated April 8, 1969, April 16, 1970 and July 24, 1970, none of which was examined by defense counsel prior to the remand proceedings. The April 8th report is a forty-five page statement with additional appendices and exhibits. Subsequent to the agent's transmittal of this "final" report, he prepared the similar but somewhat less cumbersome "supplemental" reports of April 16, 1970 and July 24, 1970.

Our review of these documents does not support the view that they are mere summaries of material contained in other volumes of the SAR. They include, for example, conclusory statements by the agent as to the identity and value of the defendant's assets and liabilities, and detailed explanations regarding the factors which were considered in arriving at these conclusions. Rather than constituting a summarization of other documents, these reports disclose the manner in which the contents of those documents were employed by the agent to arrive at his conclusions regarding defendant's assets, liabilities and expenditures during each of the taxable years. The materials thus relate to the agent's direct testimony not only in their specific content, but also in what they disclose about the deductive process which led to the agent's conclusions. Indeed, where the agent's investigation comprises the very foundation of the government's case, as it invariably does in "net worth" prosecutions, such reports can be as important to the defense for what they do not say as for what they do; cross examination might well be structured to challenge not only the factual determinations made by the agent, but the very sufficiency of his investigation.

■ It is not for this court to speculate as to the manner in which these statements might have assisted defense

counsel in the course of cross examination. Clancy v. United States, 365 U.S. 312, 316, 81 S.Ct. 645, 5 L.Ed.2d 574 (1961); Alderman v. United States, 394 U.S. 165, 182, 89 S.Ct. 961, 22 L.Ed.2d 176 (1968). We confine our attention, as we should, to a determination of whether the statements relate to the witness' direct testimony and, if so, whether it is perfectly clear that defendant was not prejudiced by their nondisclosure. We find that the SAR is replete with materials prepared by Agent Carey which relate to his direct testimony, and we do not think it is at all clear that cross examination of this witness was not hampered by denial of defendant's 3500 request. In accordance with the mandate of this court in *Cleveland I,* the conviction must therefore be vacated and defendant must be granted a new trial.

## II.

■ Having determined that the mandate of *Cleveland I* requires that appellant's conviction be vacated, we turn to a more troublesome question: given the particular method which the government employs in "net worth" cases to prove that the taxpayer has understated his taxable income, and given the scope, content and nature of the typical Special Agent's Report,[9] should the district court be required to carefully examine each of the thousands of pages contained in such multi-volume investigative re-

9. The Internal Revenue Manual is an official compilation of procedures and instructions pertaining to the operations of the Internal Revenue Service. Part IX, Chapter 5, Section 1 of the Manual prescribes the format and content of "Final Reports in Prosecution Cases", and provides that "[r]eports of each type of case should be uniform, consistent with a logical presentation of the facts. It is desirable that reports be prepared uniformly . . . and that findings be presented in the same sequence . . .". In addition, the Manual prescribes a specific format that is to be followed in order to insure uniformity. The SAR in the instant case is typical of reports following this prescribed format.

For the sake of clarification, the term Special Agent's Report, as used herein, is not limited to the "final" and "supplemental" reports submitted by the agent to his superiors relative to the investigation, such as Agent Carey's reports of April 8, 1969, April 16, 1970 and July 24, 1970. We refer to the SAR as that compilation of memoranda, tax schedules, reports, and such other documents as the Special Agent prepares in the course of his investigation. In the instant case, the district court correctly considered all of the documents contained in Volumes One through Ten as comprising the SAR. Of course, should the agent prepare other similar materials which, for some reason, are not included within the multi-volume SAR, the views which we express herein are equally applicable to such documents.

ports in order to determine which documents contained therein relate to the direct testimony of the agent who has prepared the report. For the reasons and in the respects stated herein, we hold that such an inspection is not required, and that in the future, upon motion timely made by the defendant pursuant to 18 U.S.C. § 3500, the government shall tender the SAR directly to the defendant.

Our holding in this regard is dictated by the interrelationship of several factors unique to prosecutions for tax evasion based upon the net worth method of proof.[10] These factors include:

1. The circumstantial nature of the evidence presented by the government in net worth cases, and the inferences and conclusions which must be drawn therefrom in order to conclude that the defendant has willfully evaded the payment of taxes.

2. The purpose, nature and importance of the Special Agent's testimony; the nature and scope of Special Agent's investigation; and the unique relationship of the SAR to both the investigation and the purpose and nature of the agent's testimony.

3. The impairment of judicial economy implicit in a procedure which requires the district judge to carefully examine thousands of documents in the midst of a trial.

4. The strong possibility of error implicit in the most careful of screening processes, the consequences of which may well be the reversal of numerous convictions on the ground that the defendant's constitutional right of confrontation has been impaired.

*(1) The Circumstantial Nature Of The Government's Proof.*

Above all, it must be borne in mind that net worth tax cases are entities unto themselves, a fact made abundantly clear by the Supreme Court in Holland v. United States, 348 U.S. 121, 75 S.Ct. 127, 99 L.Ed. 150 (1954). Mr. Justice Clark, speaking for an unanimous Court, noted that certiorari was granted in that case specifically for the purpose of reviewing the propriety of the net worth method of proof, stating that:

"In recent years . . . tax-evasion convictions obtained under the net worth theory have come here with increasing frequency and left impressions beyond those of the previous unrelated petitions. We concluded [in granting certiorari] that the method involved something more than the ordinary use of circumstantial evidence in the usual criminal case. Its bearing, therefore, on the safeguards traditionally provided in the administration of criminal justice called for a consideration of the entire theory", 348 U.S. at 124, 125, 75 S.Ct. at 130.

In *Holland*, the net worth method of prosecution was upheld, but only after the court had carefully outlined "the general problems implicit in this type of litigation", and had noted that "it is so fraught with danger for the innocent

10. In Holland v. United States, 348 U.S. 121, 125, 75 S.Ct. 127, 130, 99 L.Ed. 150 (1954), the Supreme Court described this method of proof as follows:
"In a typical net worth prosecution, the Government, having concluded that the taxpayer's records are inadequate as a basis for determining income tax liability, attempts to establish an 'opening net worth' or total net value of the taxpayer's assets at the beginning of a given year. It then proves increases in the taxpayer's net worth for each succeeding year during the period under examination and calculates the difference between the adjusted net values of the taxpay-er's assets at the beginning and end of each of the years involved. The taxpayer's non-deductible expenditures, including living expenses, are added to these increases, and if the resulting figure for any year is substantially greater than the taxable income reported by the taxpayer for that year, the Government claims the excess represents unreported taxable income. In addition, it asks the jury to infer willfullness from this understatement, when taken in connection with direct evidence of 'conduct, the likely effect of which would be to mislead or to conceal.' Spies v. United States, 317 U.S. 492, 499, 63 S.Ct. 364, 87 L.Ed. 418".

that the courts must closely scrutinize its use". 348 U.S. at 125, 75 S.Ct. 127. The court cautioned that although the pitfalls inherent in the net worth method of prosecution do not foreclose its use, the

"complexity of the problem is such that it cannot be met merely by the application of general rules . . . . Trial courts should approach these cases in the full realization that the taxpayer may be ensnared in a system which, though difficult for the prosecution to utilize, is equally hard for the defendant to refute . . . . Appellate courts should review the cases, bearing constantly in mind the difficulties that arise when circumstantial evidence as to guilt is the chief weapon of a method that is itself only an approximation". 348 U.S. at 129, 130, 75 S.Ct. at 132.

It was "with this admonition in mind" that this court decided *Cleveland I*, and it is this admonition that prompts us to prescribe the rule announced today.

The *Holland* Court noted that the basic assumption in net worth prosecutions is that "most assets derive from a taxable source", and that "[t]he application of such an assumption raises serious legal problems in the administration of the criminal law". 348 U.S. at 126, 75 S.Ct. at 130. Observing that the net worth method (formerly employed primarily where necessary to establish "taxable income from undisclosed sources when all other efforts failed") had been extended to include "run-of-the-mine cases, regardless of the tax deficiency involved", the Court identified several "dangers that must be consciously kept in mind in order to insure adequate appraisal of the specific facts in individual cases." 348 U.S. at 126–127, 75 S.Ct. at 130–131.

The dangers identified by the *Holland* Court may be summarized as follows:

1. The difficulty which the taxpayer encounters in proving that the apparent increase in his net worth, over that of a base year, is not an increase at all, but rather is attributable to assets owned and accumulated by the taxpayer in previous years which were hidden and not identified at that time. In this connection, it is important to determine whether the government has pursued leads which the taxpayer has supplied to investigators in support of his contention as to the acquisition of such assets.

2. The possibility that the jury will consider all unexplained increases in net worth as unreported taxable income and will disregard evidence that certain income was not taxable. "There is a great danger that the jury may assume that once the Government has established the figures in its net worth computations, the crime of tax evasion automatically follows". 348 U.S. at 127–128, 75 S.Ct. at 131.

3. The taxpayer may be "entirely honest and yet unable to recount his financial history". The net worth method has a tendency to shift the burden of proof to the defendant, requiring that he dispute the assumptions and conclusions reached by. the government on the basis of its investigation.

4. The possibility that the jury might infer the willful evasion of taxes from net worth increases alone.

5. The possibility that the prosecution will select and use only those portions of its investigation (in particular, those relating to statements made by a taxpayer "more concerned with a quick settlement than an honest search for the truth") which support the government's case.

6. Since each count of the indictment relates to a separate tax year, unless the apparent increase in defendant's net worth "can be reasonably allocated to the appropriate tax year the taxpayer may be

convicted on counts of which he is innocent".

Since the government's case in a net worth prosecution is based upon circumstantial evidence, it succeeds only where the jury infers, from the apparent increase in defendant's net worth, the existence of unreported taxable income and the willful evasion of income tax. And since these inferences are based upon the circumstantial evidence accumulated in the course of the government's investigation and presented to the jury through the testimony of the Special Agent who conducted the investigation, the SAR is a critical defense tool for challenging, through cross examination of the agent, the underlying assumptions upon which these inferences are based.

To require the government to surrender only those portions of the report which touch upon a particular item covered in the witness' direct testimony would necessitate adoption of an unreasonably narrow definition of the term "subject matter" as used in § 3500(b), and would substantially undermine the defendant's ability in net worth cases to test the correctness of the government's conclusions against information obtained in the course of the investigation but scrupulously avoided in the course of direct examination.[11] Given the circumstantial nature of the evidence and the fact that the government's case is constructed on the basis of inferences and conclusions drawn from data obtained in

the course of the investigation, the "subject matter" of the witness' direct testimony is the investigation itself, and the report thereof must be considered to relate to that testimony.[12]

### 2. Relationship Of The SAR To Both The Special Agent's Investigation And The Purpose And Nature Of The Agent's Testimony.

As previously noted, the Special Agent's investigation is the very foundation of the net worth case, and the SAR is nothing less than a detailed memorialization of that inquiry. The strength of the government's case is dependent upon the outcome of this investigation as presented to the jury through the testimony of the Special Agent who prepared it. Equally important, the strength of the defendant's case often derives from the ability to attack the thoroughness and accuracy of the investigation through vigorous cross-examination. In this context, the SAR becomes the essential nexus between the testimony of the witness and the investigation which forms the basis for the Government's contention that defendant has understated his taxable income and willfully evaded the payment of taxes. The thrust of defendant's cross-examination of the Special Agent, coupled with the clear relationship between the agent's testimony and his investigation, renders the entire SAR sufficiently related to the agent's testimony to warrant disclosure to the defendant under the Jencks Act.

11. "When the Government rests its case solely on the approximations and circumstantial inferences of a net worth computation, the cogency of its proof depends upon its effective negation of reasonable explanations by the taxpayer inconsistent with guilt. Such refutation might fail when the Government does not track down relevant leads furnished by the taxpayer—leads reasonably susceptible of being checked, which, if true, would establish the taxpayer's innocence". Holland v. United States, 348 U.S. at 135, 136, 75 S.Ct. at 135. Unless the defendant has access to the SAR, he is ill-equipped to demonstrate through cross-examination that leads, whether supplied by the taxpayer or others in the course of the investigation, have not been pursued, or that the investigation is otherwise incomplete or inadequate.

As we noted earlier, the SAR may be as important to the defense for what it does not disclose as for what it does, since the defendant's most effective approach to cross-examination may be to attack the very sufficiency of the investigation.

12. As this court stated in United States v. O'Brien, 7 Cir., 444 F.2d 1082, 1086, (1971): "However, the word 'relate' is not always limited to factual narratives. United States v. Borelli, 2 Cir., 336 F.2d 376, 393 (1964). In determining whether the statements in question 'related to' the direct testimony of the witness, it must relate *generally to the events and activities testified to*. United States v. Cardillo, 2 Cir., 316 F.2d 606, 615 (1963)."

### 3. Impairment of Judicial Economy.

The SAR consists of multi-page reports concerning the Agent's investigation, numerous memoranda of interviews, various tax schedules and exhibits and numerous other documents. It is not at all unusual for the SAR in a net worth case to consist of ten or more volumes containing thousands of pages of documents. Since § 3500(a) provides that the government is not required to tender these materials until after direct examination and, more importantly, since the district judge cannot compare the contents of the report with the Agent's testimony until that testimony has been given, the *in camera* inspection must occur between direct and cross-examination. We fail to see any way in which the court can properly review documents without carefully reading them, and we cannot conceive that such an examination could be properly conducted without a substantial delay in trial.[13]

This interruption in the midst of the trial must then be followed by still another delay in order to allow "such time as . . . [the court] may determine to be reasonably required for examination of such statement by said defendant and his preparation for its use in the trial". 18 U.S.C. § 3500(c). By requiring the government to tender the entire SAR to the defense upon completion of the agent's direct examination, the delay occasioned by *in camera* inspection of the report will be avoided. Since § 3500(a) provides that the statement need not be tendered to the defense until after direct examination, the delay attributable to the defendant's examination of the SAR can only be avoided through the reasonable cooperation between prosecution and defense counsel prior to trial. The instant case represents a commendable example of such cooperation, since much of the material contained in the SAR was reviewed by defense counsel prior to trial in order to prepare stipulations.[14]

### 4. Substantial Possibility Of Error.

In Krilich v. United States, 502 F.2d 680 (7th Cir. 1974); we note that:

"[T]he principal purpose of requiring the government to disclose prior written statements of a witness which relate to the witness' direct testimony is to facilitate cross-examination. It is principally through cross-examination that a defendant exercises his right to confront witnesses called to testify against him. Conversely, the failure to provide material to which the defense is entitled under the Jencks Act may adversely affect a defendant's ability to cross-examine gov-

---

13. The magnitude of the effort which an *in camera* review would require is reflected in the record of the proceedings on remand in the instant case. The district judge acknowledged that "I have not gone through this box of files item by item", and that "I have not looked at each page and each document that is before me", characterizing such an effort as "a completely fruitless task, so far as I am concerned, and an impossible task and a meaningless task." Accordingly, Judge Decker expressed doubt that it was this court's intention "that it would be necessary for the Court to make an *in camera* inspection of the complete files of an investigation. I may be wrong." (Transcript of proceedings, pp. 10, 11 and 27, June 27, 1973). We agree that such a task would be an extremely difficult one and, given the content of the report and the nature of the Special Agent's investigation, a task which the district judge should not be expected to undertake.

14. Rule 2.04 of the Criminal Rules of the District Court for the Northern District of Illinois provides a structured format which serves to encourage such cooperation. Where pretrial discovery in addition to that authorized by Rule 2.04(a), is sought by the defense, Rule 2.04(c) requires that defense counsel and the appropriate Assistant United States Attorney confer with respect thereto shortly after arraignment. Only upon the parties' failure to reach some form of agreement does Rule 2.04(d) authorize them to pursue the issue as a contested matter before the district judge. The pretrial cooperation of counsel in the instant case, so appropriately characterized by Judge Decker as "excellent", was attributed primarily to their "2.04 conference" (transcript of remand proceedings, p. 8). Experience demonstrates that the parties, once compelled to confer with respect to such matters as pretrial disclosure of written material, often find it in their own best interests to cooperate.

ernment witnesses and thereby infringe upon his constitutional right of confrontation. Non-compliance with a statute which has as one of its purposes the effectuation of a constitutional right presents an issue of sufficient constitutional dimension to warrant consideration under 28 U.S.C. § 2255 [footnotes omitted].

■ Where trial error results in the denial of a defendant's constitutional right, the conviction must be vacated and a new trial must be ordered unless the court is able to declare that the error was harmless "beyond a reasonable doubt". Chapman v. California, 386 U.S. 18, 24, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967) In the context of the Jencks Act, the failure, upon proper motion, to tender to the defense material which relates to the witness' direct testimony is harmless beyond a reasonable doubt only if it can be said that it is perfectly clear that defendant has not been prejudiced by the error. United States v. Cleveland, 477 F.2d 310, 316, n. 9 (7th Cir. 1973).

Even if the district judge scrupulously and carefully examines the entire SAR, the sheer volume of material increases the possibility of error enormously. On appeal, the defendant will invariably attempt to demonstrate that certain of the documents excluded through the *in camera* inspection related to the witness' testimony. Given the massive volume of documents involved, the opportunity for the commission of reversible error is obvious, and where such error is found, it will usually be necessary to remand the case for a new trial. Avoidance of such

duplicative litigation is itself a worthwhile objective, and one which will be furthered by requiring the government to tender the SAR directly to the defense in accordance with § 3500(b).[15]

### 5. *In Camera Inspection Of Materials Which Do Not Pertain To The Agent's Investigation.*

Our conclusion that the SAR is sufficiently related to the agent's testimony to warrant its direct submission to the defense pursuant to subsection (b) is premised upon the view that, in a net worth tax case, the agent's testimony concerns the findings and conclusions derived from his investigation, and his investigation, therefore, constitutes the subject matter of his testimony. It follows that written materials prepared by or under the direction of the agent, which concern the conduct substance or results of that investigation, related to the subject matter of the agent's testimony and must be tendered directly to the defense under § 3500(b).

■ We are not unmindful, however, of the possibility that the SAR may also include a limited number of documents which do not pertain to the conduct, substance or results of the investigation, the production of which (unless otherwise related to the agent's testimony) would not be required under the Jencks Act. Such materials might include, for example, interoffice memoranda of a purely administrative nature, memoranda to government attorneys in the nature of recommendations for prosecution, and the like. While, under the facts of a particular case, documents of

15. The views which we express in this regard should not be misconstrued as intimating that a district court, in other than a net worth tax evasion case, may forego the *in camera* inspection of voluminous documents solely because such a task will consume a substantial amount of time and may offer the increased opportunity for the commission of error. § 3500(b) requires that statements relate to the witness' testimony and § 3500(c) requires an *in camera* inspection where the government contends that the requested materials do not relate to the witness' testimony. Thus, impairment of judi-

cial economy and substantial possibility of error, though rendering direct submission of such documents to the defense desirable, do not necessarily compel such a procedure. In net worth tax evasion prosecutions, however, these factors are coupled with a compelling recognition that the SAR is, for the reasons we have discussed, related to the testimony of the Special Agent who prepared the statement. Where such a relationship is established, § 3500(b) requires that the statement be "delivered directly to the defendant for his examination and use."

this nature might be related to the agent's testimony, the government should be afforded the opportunity to contend otherwise, in which event the *in camera* procedure set forth in subsection (c) should be utilized. Where the government contends that written material unrelated to the conduct, substance or nature of the investigation is included in the SAR, the specific documents in question should be segregated and tendered to the district judge for his review, accompanied by a brief statement outlining the basis for the government's contention that the material is unrelated to the agent's direct testimony.

## CONCLUSION

We have taken this occasion to prescribe a rule which, in our view, will conserve judicial economy and preserve "the safeguards traditionally provided in the administration of criminal justice." Holland v. United States, 348 U.S. at 125, 75 S.Ct. at 130. The *Holland* Court observed that the "net worth method . . . has evolved from the final volley to the first shot in the Government's battle for revenue, and its use in the ordinary income-bracket cases greatly increases the chances for error" 348 U.S. at 126–127, 75 S.Ct. at 131. The Court recognized that this method of prosecution "is so fraught with danger for the innocent that the courts must closely scrutinize its use." 348 U.S. at 125, 75 S.Ct. at 130.

Since the government's case is built upon the results of the Special Agent's investigation, as presented to the jury through the agent's testimony, cross-examination of this witness is often the

most critical stage of the defendant's case. We believe that the "chances for error" will be substantially decreased and the "dangers" inherent in net worth prosecutions will be lessened where the defendant has full access to the SAR. Where cross-examination of a particular witness is of such critical importance, the Supreme Court's remarks in Alderman v. United States, 394 U.S. 165, 89 S.Ct. 961, 22 L.Ed.2d 176 (1969) are of particular significance:[16]

> "An apparently innocent phrase, a chance remark, a reference to what appears to be a neutral person or event, the identity of a caller or the individual on the other end of a telephone, or even the manner of speaking or using words may have special significance to one who knows the more intimate facts of an accused's life. And yet that information may be wholly colorless and devoid of meaning to one less well acquainted with all relevant circumstances. Unavoidably, this is a matter of judgment, but in our view the task is too complex, and the margin for error too great, to rely wholly on the *in camera* judgment of the trial court to identify those records which might have contributed to the Government's case." 394 U.S. at 182, 89 S.Ct. at 971.[17]

Nor do we view Palermo v. United States, 360 U.S. 343, 79 S.Ct. 1217, 3 L. Ed.2d 1287 (1959) as precluding a rule which requires the government to tender the SAR directly to the defendant. In *Palermo*, the court stated that:

> "[t]he [Jencks] Act's major concern is with limiting and regulating de-

16. In *Alderman* the court rejected the Government's contention that electronic surveillance records should be subjected to *in camera* inspection by the trial judge and surrendered to the defense only if the trial judge determines the records to be arguably relevant to petitioner's prosecution.

17. See also Dennis v. United States, 384 U.S. 855, 86 S.Ct. 1840, 16 L.Ed.2d 973 (1966). The *Dennis* Court required that grand jury testimony be tendered to the defense, stating that:
"Trial judges ought not to be burdened with the task or the responsibility of ex-

amining sometimes voluminous grand jury testimony in order to [determine] inconsistencies with trial testimony. . . . Nor is it realistic to assume that the trial court's judgment as to the utility of material for impeachment or other legitimate purposes, however, conscientiously made, would exhaust the possibilities. In our adversary system, it is enough for judges to judge. The determination of what may be useful to the defense can properly and effectively be made only by an advocate."

fense access to government papers, and it is designed to deny such access to those statements which do not satisfy the requirements of (e), or do not relate to the subject matter of the witness' testimony". 360 U.S. at 354, 79 S.Ct. at 1226.

Accordingly, the Court held that *"when it is doubtful* whether the production of a particular statement is compelled by the statute" (emphasis added), an *in camera* examination of the document is in order.

This court held in *Cleveland I* that the SAR is a "statement" for the purposes of § 3500(e). Given the nature of the case, the method of proof employed by the government, and the nature of the Special Agent's testimony, the SAR "relates to the subject matter as to which the witness has testified". Accordingly, it is not "doubtful" whether the production of the SAR is required by the statute and, pursuant to § 3500(b), this "statement" must therefore be "delivered directly to the defendant for his examination and use".

Reversed and remanded.