**UNITED STATES of America,**
**Plaintiff-Appellee,**

v.

**Anthony ESPOSITO,**
**Defendant-Appellant.**

**No. 74–1770.**

United States Court of Appeals,
Seventh Circuit.

Argued March 31, 1975.

Decided Aug. 18, 1975.

Rehearing Denied Sept. 16, 1975.

---

Thomas P. Sullivan, Russell J. Hoover, Chicago, Ill., for defendant-appellant.

Samuel K. Skinner, U. S. Atty., Gary L. Starkman, Thomas K. McQueen, Asst. U. S. Attys., Chicago, Ill., for plaintiff-appellee.

Before SWYGERT, CUMMINGS and SPRECHER, Circuit Judges.

CUMMINGS, Circuit Judge.

Defendant was charged in a two-count indictment with the possession and distribution of 206.5 mg. of cocaine in violation of 21 U.S.C. § 841. After a jury trial, he was found guilty on both counts. Thereafter, the district court granted his motion for arrest of judgment on the ground that Congress had no power to regulate the use and distribution of cocaine without requiring proof in each prosecution of some connection with interstate commerce. We reversed and remanded the cause for entry of judgment on the verdict. 492 F.2d 6 (7th Cir. 1973), certiorari denied, 414 U.S. 1135, 94 S.Ct. 879, 38 L.Ed.2d 760. Defendant was then sentenced to two-year terms of incarceration plus statutory special parole terms of three years, to run concurrently on each count.

At the February 1972 trial, the Government's chief witness, Charles Crimaldi, testified that on June 22, 1971 defendant telephoned to invite him to breakfast at the Hyatt Regency O'Hare Hotel in Rosemont, a Chicago suburb, on June 23. Crimaldi accepted and then contacted Special Agent David Haight of the Bureau of Narcotics and Dangerous Drugs ("Bureau").[1]

The testimony at trial further shows that on the morning of June 23rd, Crimaldi met with Haight and Special Agent Edward Nolan at the Howard Johnson Motor Lodge near the Hyatt Regency O'Hare. The agents searched Crimaldi and his automobile and placed a kel-set transmitter on him. Afterwards Crimaldi proceeded to the Hyatt Regency O'Hare where he joined Esposito in the coffee shop at 9:30 a.m.

The breakfast meeting was monitored on the kel-set by Agent Nolan. Although an attempt to record the conversation on tape proved unsuccessful, Agent Nolan's account of the conversation was substantially the same as Crimaldi's. Crimaldi told defendant that he was interested in buying some drugs and understood that Esposito might know of a source. Defendant replied that he used to have a source but did not know whether it was still active. He agreed to find out whether the source was operative and asked Crimaldi about quantities. Crimaldi said that he wanted 2 kilos of cocaine per week. Esposito replied that amount "would be good but we couldn't meet every week, it would have to be a once-a-month drop on it, because if we met every week, [we] would be taking too many chances of getting arrested." Esposito left the table for a few minutes and upon his return stated that "The party wasn't in and he had left a phone number to have the party get in touch with him." After breakfasting, both men left the hotel through separate exits.

Crimaldi returned to the Bureau's office with Haight and Nolan. He received a message there to call his home. When he did so, he was given a number for contacting Esposito. He called the number and Esposito said, "Listen, I have to see you." They arranged to meet at the same coffee shop at four o'clock. A recording of this telephone conversation was played to the jury. Before the meeting, Crimaldi was again fitted with a transmitter and he and his car were searched by Haight and Nolan. On this occasion, no agent testified that he heard the conversation over the kel-set.

Before the afternoon meeting, Special Agent Frank Cruz began surveillance of defendant from the third floor balcony of the Hyatt Regency O'Hare. He saw Crimaldi come into the coffee shop-lounge area on the second level and approach Esposito. Cruz witnessed Esposi-

1. This agency is now called the Drug Enforcement Administration.

to's attempt to place a Parliament cigarette package in Crimaldi shirt pocket. This attempt failed, apparently because Crimaldi's own cigarettes were in that pocket. Defendant then placed the package in Crimaldi's left jacket pocket. Crimaldi testified that Esposito told him that the package contained a sample of the cocaine.

Defendant and Crimaldi proceeded to the rooftop lounge of the Hyatt Regency O'Hare for a drink. Defendant explained that he had contacted his source who had 25 ounces of cocaine, with only 5 ounces committed to another. Defendant said he could obtain 20 ounces of cocaine at $750 an ounce for Crimaldi. The latter remonstrated about the high price and told defendant to call him at home that evening for an answer about the proposed sale.

Crimaldi then drove to the nearby Howard Johnson Motor Lodge and gave to Agent Haight the cigarette package which Esposito had delivered to Crimaldi. He and his car were searched a third time. Enclosed in the package was a piece of tinfoil containing a glassine packet with 206.5 mg. of cocaine, the amount mentioned in the indictment. Agent Haight testified that Crimaldi smoked Parliaments and that, during the search prior to the meeting where the sample was delivered, the package of Parliaments then on his person was searched by Agent Nolan. Haight also testified that Crimaldi had his original package of cigarettes at the search after the delivery in addition to the one containing the cocaine, and that the package containing the cocaine was a "soft pack," while Crimaldi's own cigarettes were in a "hard pack."

At 11:00 p.m. that night, defendant phoned Crimaldi and arranged to meet him the next afternoon. A tape of this call was also played for the jury. Crimaldi asked, "That's 20—what we talked about?" Defendant responded in the affirmative and said, "I will call him right now." Five minutes later, defendant again telephoned Crimaldi and asked if he wanted "the five." Crimaldi told defendant that because of defendant's prior advice that he had somebody else for the other five, Crimaldi had "backed off" as to it. However, he told defendant that he would take "two [referring to the 20 ounces] for sure" and would let defendant know at their meeting on the next day "about the other five."

On the next afternoon, Crimaldi returned to the Regency Hyatt O'Hare. Bureau Agent Haight saw Esposito driving through the parking lot, but he failed to meet Crimaldi. That evening Esposito telephoned Crimaldi and explained that it go so "hot" at the parking lot, referring to the Bureau agents there, that he had returned to his home.[2] Later defendant telephoned Crimaldi to say that things were getting complicated and that he was sorry he was unable to help him. Tapes of these conversations were also played for the jury.

Three witnesses testified for the defense. Two were called to impeach Cri-

---

**2.** After noting the "heat" in the parking lot, Esposito told Crimaldi that "it was beating down so hard, I am surprised that you weren't warm." The dialog, with Crimaldi speaking first, included the following:

"Are you sure it [the 'heat'] was for us or something else?"

"Well, they were very interested in coming around a couple of times and down the block and around the block. Definitely. How is your phone?"

"Good, real good. It is—over here we have got underground cables."

"Well, all right. They picked me up when I pulled in. I came around twice and come in and jumped in and out and come down the block and stopped with me and went around again and stopped with me again and wait there for the car. So, if it ain't your end it is the other end."

"It's gotta because nothing came after me, you know."

"They didn't come after me. They were waiting."

On cross-examination Esposito admitted that the recording was a conversation between Crimaldi and himself, but said that the "double talk" about "heat" etc. was because Crimaldi did not want his wife "to know what was going on in his dealings."

maldi's testimony. Defendant's brother Frank testified that Crimaldi was a heroin addict and had given Frank heroin in the past. Edward Brabec, a Chicago Journeymen Plumbers Union official, testified that Crimaldi had been expelled from the union for non-payment of dues. An objection to Brabec's testimony was sustained on the grounds that it failed to impeach anything which Crimaldi had said on the witness stand. On cross-examination, Brabec acknowledged that Crimaldi's expulsion from the union for non-payment of dues did not mean that he would have been unable to work as a plumber in the years in which he had said that he had so worked. Furthermore, Brabec stated that under the practices of his union a non-member could work out of the union's hiring hall and that the records which he had with him pursuant to a subpoena would not show whether Crimaldi had worked as a plumber after his expulsion from the union.

Defendant also testified and gave a different version of the June 23 events. According to defendant, Crimaldi solicited the meeting in order to borrow money. Crimaldi also asked defendant whether he could provide Crimaldi with heroin, and Esposito admitted replying, "Yes, maybe I can." Defendant denied that the subject of heroin came up thereafter and denied that cocaine was ever mentioned. According to defendant, at the afternoon meeting on June 23, Crimaldi requested $2,000 from Esposito's union because of juice loan obligations. Defendant replied that instead he would try to obtain personal funds for Crimaldi. Defendant denied that he gave Crimaldi any cocaine that afternoon.

### Government's Non-Disclosure of Additional Impeachment Material About Crimaldi

On May 25 and 27, 1971, Bureau Agents Boerner, Braseth and Safir taped an interview with government informer Crimaldi in Washington, D. C. The existence of this tape was not disclosed to defense counsel prior to or at the trial. On the day before the hearing on the third motion for a new trial, the prosecutor who tried the case notified defense counsel that he had discovered the taped interview.

After the May 1974 hearing on that motion for a new trial, Judge McMillen examined *in camera* the 131-page transcript of the Crimaldi taped interview before filing an order denying a new trial. In the order he pointed out that "the government does not deny that the tape was made by him [Crimaldi] and that its existence was known to [the initial prosecutor Peter Vaira, who was in the case only until the indictment was returned, but not to J. Michael Fitzsimmons who tried the case [3]] before trial." However, the court concluded that failure to show the tape to defense counsel or to submit it to the court *in camera* was not ground for setting aside the jury's verdict of guilty. The court described the tape as follows:

"The tape contains much irrelevant and confidential information about criminal activities of persons other than Crimaldi. It does not impeach his trial testimony. It does confirm the defendant's information that Crimaldi was involved in collecting for a juice loan racketeer and that he has admitted to various illegal acts in this occupation as well as to other illegal acts, some similar to those for which he had previously been convicted and some not. He does not admit * * * to any activities involving narcotics."

We have also examined the transcript of the tape and a summary of the highlights thereof and largely agree with the district court's description of its contents. It contains no evidence tending to exculpate the defendant. Since the statement was made before the transaction charged in this case, its only value

---

**3.** Fitzsimmons stated at the new trial hearing that he had no knowledge of the tape. This is not directly refuted elsewhere in the transcript of that hearing and the district court apparently credited Fitzsimmons' account.

to defendant was in possibly impeaching Crimaldi.

The district court's opinion was based on four grounds:

1. Information revealed in the transcript was only collaterally relevant to Crimaldi's testimony and does not exculpate defendant. Therefore, according to the court below, the only conceivable use the defense could have made of the tape would have been in cross-examining Crimaldi about his reputation and criminal activities. In the absence of perjury, this type of material need not be disclosed under *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215; *Napue v. Illinois*, 360 U.S. 264, 79 S.Ct. 1173, 3 L.Ed.2d 1217; *Giglio v. United States*, 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104.

2. Most of the matters discussed by Crimaldi in the interview concerned his association with Sam de Stefano in the juice loan business. Although defendant and his counsel knew of this activity of Crimaldi, defense counsel did not exhaust the inquiry at the trial as "a matter of trial strategy which was knowingly and intentionally adopted."

3. The outcome of the trial would not have been different if the defendant had been given the tape. In making this determination, the district court relied upon the evidence supporting Crimaldi's account of the crucial meeting:

"The defendant's conviction was based upon eyewitness accounts of a controlled transaction, preceded by a tape-recorded telephone conversation and supported by on the scene photographs."

4. The material in the transcript raises considerable doubt as to its reliability and would have diverted attention from the true issues. The jury already knew that Crimaldi was a convicted felon, a government informant and a possible juice collector.

After marshalling the foregoing reasons supporting its decision to deny a new trial, the district court remarked that the Government was not blameless, for the trial prosecutor should have been made aware of the tape by others in the Government. The trial judge also noted that it would then have been "the better part of valor" to turn it over to the defense or let the court evaluate it *in camera*.

We affirm the district court's denial of a new trial.

*Whether Failure to Produce Tape Before or During Trial Requires Reversal Under the Jencks Act*

■ Under the Jencks Act,[4] after a government witness has testified on direct examination, on request the Government is required to produce any statement of the witness in its possession "which relates to the subject matter as to which the witness has testified." 18 U.S.C. § 3500(b). The tape in question qualifies as a statement under that statute. 18 U.S.C. § 3500(e)(2). The Government now concedes in its brief that it should have given the tape to the court for *in camera* inspection. Judge McMillen found the information contained on the tape was not relevant to Crimaldi's testimony at trial "except collaterally." Pursuant to *United States v. Cleveland II*, 507 F.2d 731, 736 (7th Cir. 1974), we have examined the transcript of the tape to see "whether the statements relate to the witness' direct testimony and, if so, whether it is perfectly clear that defendant was not prejudiced by their nondisclosure."[5] The tape does show that Crimaldi had engaged in armed robbery and burglary. However, he so acknowledged on his direct examination, so that there was no prejudice to

---

4. Petitioner raises the Jencks Act argument only in a footnote to his brief. While it is clear that he did not press this point vigorously on appeal, we decide it here.

5. See *United States v. Cleveland I*, 477 F.2d 310, 316 n. 9 (7th Cir. 1973).

defendant in not disclosing this portion of the tape.

Defendant contends that the portion of the tape where Crimaldi admitted to various criminal activities was also producible under the Jencks Act because it could be used to impeach Crimaldi's testimony that he was working as a plumber during certain years. The tape does not preclude the possibility that Crimaldi worked as a plumber even while he was engaged in the criminal activities. Indeed, it indicates that he became a journeyman plumber after starting his services for Sam de Stefano, thereby implying that he worked as a plumber at the same time that he was engaged in unlawful conduct as a juice loan enforcer. Therefore, while it is not clear that the taped admissions were relevant to the testimony on direct regarding Crimaldi's employment as a plumber, it is perfectly clear that defendant was not prejudiced by the Government's failure to release these excerpts. Since the trial judge was correct in his analysis that the tape does not otherwise relate to the subject matter of Crimaldi's direct examination, the Government's failure to tender the tape to the trial judge for *in camera* inspection during the trial does not constitute reversible error.

### Whether Non-Production of Tape Was Harmless Error Under Brady

■ Next we must consider whether the doctrine of *Brady v. Maryland, supra,* requires reversal for failure to produce the tape. In a series of cases, the Supreme Court has spoken to the due process requirement for forthrightness on the part of the prosecution in presenting all the material evidence to the jury. *Mooney v. Holohan,* 294 U.S. 103, 55 S.Ct. 340, 79 L.Ed. 791; *Napue v. Illinois, supra; Brady v. Maryland, supra; Giglio v. United States, supra.* It is clear that the Government has an obligation to reveal to the defense such evidence in its possession as would be material to impeaching a prosecution witness. *Brady, supra; Giglio, supra; Marrero v.*

*United States,* 516 F.2d 12 at p. 14 (7th Cir., decided May 14, 1975); *United States v. Crisona,* 416 F.2d 107, 115 (2d Cir. 1969), certiorari denied, 397 U.S. 961, 90 S.Ct. 991, 25 L.Ed.2d 253. However, under *Brady,* as interpreted in *Moore v. Illinois,* 408 U.S. 786, 92 S.Ct. 2562, 33 L.Ed.2d 706; the defendant is not entitled to a reversal unless "in the light of all the evidence" introduced at trial the unrevealed evidence is material. *Moore v. Illinois, supra,* at 795, 797, 92 S.Ct. at 2569. Thus the materiality determination is not to be made in a vacuum; rather it must be made in the context of all the evidence introduced at trial. In our view, it is unnecessary to make the materiality determination under *Brady* in this case because it is clear that, even assuming that the tape was "material" in the *Brady* sense, government counsel's good faith failure to reveal it to the defense was harmless error.

■■ Assuming that the tape should have been produced, the trial judge was correct in noting that the particular prosecutor's ignorance of the tape's existence will not fully justify the Government's failure to produce it. See *Giglio v. United States, supra,* 405 U.S. at 154, 92 S.Ct. 763; *Santobello v. New York,* 404 U.S. 257, 262, 92 S.Ct. 495, 30 L.Ed.2d 427; *United States v. Ott,* 489 F.2d 872, 874–875 (7th Cir. 1973); *Clarke v. Burke,* 440 F.2d 853, 855 (7th Cir. 1971); American Bar Association Project on Standards for Criminal Justice, Standards Relating to Discovery and Procedure Before Trial, § 2.1(d) and comment (e), at 78 (1970). In *Brady v. Maryland, supra,* 373 U.S. at 87, 83 S.Ct. at 1196, the Supreme Court held:

> "that the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, *irrespective of the good faith or bad faith of the prosecution*" (emphasis added).

However, a court should be less inclined to hold unproduced evidence immaterial or to hold the non-production of admittedly material evidence harmless error if

the prosecutor's failure to reveal the evidence was not in good faith. See *United States v. Gerard*, 491 F.2d 1300, 1302 (9th Cir. 1973); *United States v. Butler* (9th Cir. Nos. 74–2000 and 74–2201, decided December 18, 1974), slip op. at 7–8; see also, *Clarke v. Burke, supra*, at 855; *United States v. Keogh*, 391 F.2d 138, 148 (2d Cir. 1968). On the other hand, if the non-production is in good faith, no special benefit of the doubt need be given the defendant's position.

In the instant case, the district court did not find that the government attorneys concealed the existence of the tape out of improper prosecutorial motives or otherwise in bad faith. It appears from its order denying the new trial that the district court credited the testimony of the government attorneys tending to show that the failure to reveal the tape to the court was in good faith. Consequently, neither the Government nor the defendant is entitled to any special treatment as to the harmless error issue.

The Government asserts that even if the tape were producible under *Brady*, the Government's failure to produce it was harmless error because (1) much of the impeachment material on the tape was known to the defendant and was in evidence at trial; (2) the crucial parts of Crimaldi's testimony were thoroughly corroborated by other testimony and tape recordings; (3) Crimaldi was substantially impeached before the jury; and (4) the opportunity to explore an area of impeachment that was on the tape was deliberately avoided by defense counsel as a matter of trial strategy. We agree that any error was harmless.

The tape does show Crimaldi's convictions, but they were put before the jury on direct examination. Furthermore, the defendant's counsel was provided with Crimaldi's arrest and conviction record prior to trial.[6] Thus defendant cannot fairly complain of perhaps the most potent impeachment evidence on the tapes.

The corroboration of Crimaldi's most material testimony is virtually complete. The actual transfer of the narcotics was witnessed by Agent Cruz. Crimaldi was searched for narcotics before meeting the defendant and none were found. Nor was the cigarette package containing the drugs on Crimaldi's person or in his car when he departed for the meeting with the defendant. Crimaldi's testimony that a cocaine sale was discussed during his first meeting with the defendant was corroborated by an agent who heard the conversation via hidden radio. The tape-recorded telephone conversations about possible availability of the other "five" and about Esposito's decision to break his date with Crimaldi because of the "heat" are also corroborative of Crimaldi's story. In light of all this corroboration, the establishment of Crimaldi's personal unreliability could mean little to the jury. *United States v. Teague*, 445 F.2d 114, 121 (7th Cir. 1971).

Crimaldi's two prior felony convictions were put before the jury, so that his personal reliability was called into serious question anyway. Moreover, it was made clear that Crimaldi was a paid informant for the Bureau and that he received a bonus if his performance pleased the Bureau. There was a question put about Crimaldi's employment as a juice loan collector, which he was clearly reluctant to confirm or deny. Also, one of the Bureau agents testified that Crimaldi had been associated with "organized crime." Defendant's brother testified that he had received heroin from Crimaldi, and defendant testified that Crimaldi approached him for money which Crimaldi owed "in connection with his juice racket that he is connected with and is a terrorist for * * *." Thus the jury had sufficient facts to weigh Crimaldi's credibility, so that a new trial was not required. See *Flores v. Craven*, 503 F.2d 1030 (9th Cir. 1974); *per curiam* ), certiorari denied, 420 U.S. 911, 95 S.Ct. 833, 42 L.Ed.2d 842. Finally,

---

**6.** Unlike the situation in *People v. Galloway*, 59 Ill.2d 158, 319 N.E.2d 498 (1974), there was no false representation of Crimaldi's arrest record.

the jury's question about Agent Cruz' observation of the actual transfer of the cocaine indicates that its members were interested in the corroborative testimony about the transaction, rather than merely accepting Crimaldi's account at face value.

■ At the May 1974 hearing on the motion for a new trial, defendant testified that he knew Crimaldi's reputation as a murderer, but did not so advise his counsel. In this posture he cannot now complain that his counsel was entitled to see a transcript of the May 1971 interview to the same effect. Esposito also testified that he told his trial counsel that Crimaldi was a juice loan terrorist. After touching on the subject in cross-examining Crimaldi, Esposito's trial counsel did not ask the judge to compel Crimaldi to answer whether he had been a juice collector or to explain his refusal to answer. We agree with the trial court's characterization that "this was a matter of trial strategy which was knowingly and intentionally adopted."

As Judge Pell stated in *United States v. Cook,* 432 F.2d 1093, 1101–1102 (7th Cir. 1970), certiorari denied, 401 U.S. 996, 91 S.Ct. 1224, 28 L.Ed.2d 535:

"Where parties, even in a criminal case, knowingly and deliberately turn down a course of procedure which at the time appears to be to their best interest, they cannot be permitted at a later time after a decision has been rendered adverse to them, to obtain a retrial according to the procedure which they had voluntarily discarded and waived."

■ In light of the extensive corroborative testimony and the other factors discussed above, the revelation of the tape and the defendant's use of that information therefrom which would have been made available to him by the district court after an *in camera* inspection would not have affected the jury's assessment of Crimaldi's credibility. Also, in view of the vigorous defense, the jury was obviously cautious about Crimaldi's personal truthfulness and therefore relied on the corroborative evidence to find defendant guilty. Since the tape had impeachment value only and it would not have affected the jury's assessment of Crimaldi's credibility if given to the defense, its revelation would not have produced a reasonable doubt in the eyes of the jury.[7] *Giglio, supra* at 154; *United States v. Marrero, supra; United States v. Tankersley,* 492 F.2d 962, 967–968 (7th Cir. 1974); *Grant v. Alldredge,* 498 F.2d 376, 382 (2d Cir. 1974); *United States v. Butler, supra,* at 7–8.[8]

### Alleged Government Exploitation of False Testimony

■ Defendant's appellate counsel insists that the prosecutor sought to impress the jury that Crimaldi was a plumber whose criminal escapades were remote in time. Defendant asserts that this amounts to Government exploitation of testimony known to be false by virtue of the tape.

At the trial, Bureau Agent Haight stated that he could not recall being told that Crimaldi had been in the juice loan business. However, defendant and his counsel knew of that activity of Crimaldi. While Haight admitted at the May 1974 post-trial hearing that he was in error in his earlier testimony, the district judge found:

"We agree that Agent Haight has been impeached but not that he committed perjury. Furthermore, his testimony was not crucial to defendant's guilt, and his credibility was not at

---

7. Assuming that the impeachment evidence is "evidence favorable to the defendant" within local Criminal Rule 2.04(a)(6) and (e), any violation thereof with respect to the taped interview is harmless for the reasons noted in the discussion of defendant's *Brady* argument.

8. Defendant relies on *Butler,* but there the newly discovered tape of a surreptitiously recorded conversation between the key government witness and appellant and post-trial affidavits indicated that the Government had promised the witness lenient treatment in return for his testimony. The court held that such evidence "would certainly have affected the weight given [the witness'] testimony by the jury."

stake. The government should not be penalized because of the carelessness of this witness."

Since the trial judge was in a position to assess Haight's credibility at trial and at the hearing on the motion for a new trial, we should not set aside his assessment, particularly since Esposito's trial counsel pursued the juice loan angle as much as he desired. See *United States v. Acarino*, 408 F.2d 512, 516 (2d Cir. 1969), certiorari denied 395 U.S. 961, 89 S.Ct. 2101, 23 L.Ed.2d 746.

As has already been discussed, the tape does not establish that Crimaldi worked in the juice loan business to the exclusion of his work as a plumber. At the trial, under cross-examination by the prosecutor, an officer of the Chicago plumbers' union stated that Crimaldi might have been working as a plumber after his March 1969 expulsion from the union. While the transcript of the May 1971 taped interview with Crimaldi states that he became a journeyman plumber in 1955 or thereabouts, the transcript does not show that he abandoned that occupation in 1969. Nothing in the record or at the post-trial hearing shows that Crimaldi did not practice his trade as he testified.

### Closing Argument

■ Defense counsel assails the prosecutor's trial summation for "attacking the crucial defense theory that Crimaldi was an informer with a clear motive to lie." However, that part of the prosecutor's summation was a proper response to the distortions in Esposito's trial counsel's closing argument asking the jury to infer that Crimaldi had been caught doing something, "probably selling heroin" and was then set up by the Government "as a pigeon." He stated that Crimaldi had become a partner of the Bureau by giving the Bureau information in return for "a pass." None of this was supportable by the record nor indeed by the transcript of the May 1971 tape of Crimaldi's Washington, D. C. interview. Therefore, the criticized rebuttal argument was justified.

Part of the rebuttal argument is quoted critically in defendant's brief 29:

" * * * [T]here is absolutely no evidence that [a promise of no jail in return for favorable testimony] is the case here * * * And in fact the evidence is to the contrary.

" * * * [Crimaldi] told you when he was in jail, and he told you what for, twenty years ago * * * Agent Haight told you that he was not under charge now and that there was nothing pending against him now. So that whole theory about doing it to get out from under, worthless."

The taped interview and record are not to the contrary. Rather than picturing Crimaldi as a model citizen, the prosecutor stressed that even if the jury believed that Crimaldi was involved in juice collection or some other criminal activity, his testimony was confirmed "by a tape recorder, by a surveillance agent, or by the Kel set."

■ Defense counsel relies on other portions of the prosecutor's closing argument as compelling reversal. However, no objection was raised to these comments at trial and therefore defendant must rely on a plain error theory. Fed. R.Cr.P. 51 and 52.

Specifically, defendant claims that the Government wrongfully characterized him as "a narcotics pusher of the first order," a man "in the business of selling cocaine," "an incredibly stupid man," and "the lowest form of life in the country." However, Esposito's own trial counsel had referred to Crimaldi as "the lowest form of life," "a peddler himself" and "a bounty hunter." Defense counsel referred to "rats like Crimaldi" and a "worm like Crimaldi." He referred to his own client as "Mr. Goof."

In this setting, it was permissible for the prosecutor to respond that one who sells narcotics was a form of life lower than an informant. By calling Esposito "incredibly stupid," the prosecutor was merely paralleling defense counsel's characterization of Esposito as "Mr. Goof." By mentioning that defendant

was "in the business of selling cocaine" and a "narcotics pusher of the first order," the prosecutor was referring to the evidence in the record that Esposito had a source of cocaine and intended to sell Crimaldi 25 ounces of cocaine after only a day's notice.

█ Finally, to answer Esposito's lawyer's statement that defendant did not need to be a pusher because he earned $35,000 a year as a union official, the prosecutor stated: "Although he [Esposito] makes $35,000, which is a considerable salary, when you are selling cocaine, it is considerably more than tax free." This statement was unfortunate and confusing but it legitimately shows that in selling cocaine Esposito might have been motivated by a desire to make more than $35,000 a year. It certainly did not tell the jury that Esposito did not report narcotics income on his tax return, as stated in defendant's brief. As in *United States v. Skelley*, 501 F.2d 447, 456 (7th Cir. 1974), certiorari denied, 419 U.S. 1051, 95 S.Ct. 629, 42 L.Ed.2d 647, this comment does not rise to the dignity of plain error requiring reversal in the absence of an objection below.

### *Conflict in Testimony of Government Witnesses*

█ As his last point, defendant asserts that newly discovered facts suggest perjury on the part of the government witnesses necessitating a new trial.

As to Agent Haight, defendant asserts that his testimony that he performed a field test on the contents of the Parliament cigarette package given Crimaldi by Esposito "a very short period of time" after its receipt from Crimaldi was inconsistent with his testimony in two later federal trials that Haight and Nolan had conducted a surveillance of Esposito after receiving the cigarette package from Crimaldi. The testimony at the two later trials is consistent with Haight's testimony on cross that he began his surveillance of Esposito at 5:00 p.m. on June 23 until 7:00 or 7:30 p.m., thus placing him at the Bureau when

that surveillance ceased. The length of time until the field test is not crucial and, in any event, Agent Haight might consider two hours a relatively short period. Similarly, assuming certain traffic patterns, it was perfectly possible for Haight to see Esposito enter the Thirsty Whale Restaurant at 5:30 p.m., dispelling defendant's argument that perjury was proved by physical impossibility.

As to Agent Cruz, defendant asserts that his grand jury testimony was in conflict with his trial testimony. Before the grand jury, Cruz said that Crimaldi arrived first at the afternoon meeting at the Hyatt Regency O'Hare, while at Esposito's trial he said that Esposito had arrived first. However, Cruz' account of the actual transfer did not vary. Moreover, at the perjury trial of Esposito (not involved on this appeal), Cruz explained that he was mistaken before the grand jury and that Esposito was actually the first to arrive.

As to Agent Nolan, defense counsel states that at the trial, Nolan testified to rather extensive searches of Crimaldi's automobile, once in the morning and twice in the afternoon of June 23. At Esposito's perjury trial a year later, Crimaldi testified that the third afternoon search was more cursory. The more important afternoon search occurred before Crimaldi went to meet Esposito, and no inconsistency has been charged with testimony as to that search. Once Crimaldi gave the agents the narcotic, little reason for a thorough search remained. In any event, even at the perjury trial, Crimaldi admitted that some type of third search had occurred in the afternoon when he returned with the cigarette package.

With respect to the alleged inconsistencies in the testimony of government witnesses in Esposito's narcotics trial and in subsequent cases, Judge McMillen found as follows:

"The difference in testimony relates to details subsequent to the alleged offense, primarily. The eyewitness accounts, recorded telephone calls and photographs would be substantially

unaffected by subsequent inconsistent testimony."

Substantial evidence supports this conclusion of the district court, so that a new trial is not necessary. *United States v. Johnson*, 327 U.S. 106, 113, 66 S.Ct. 464, 90 L.Ed. 562.

Judgment affirmed.

SWYGERT, Circuit Judge (concurring).

I concur in the majority's decision that the failure to produce this tape is harmless error, but I cannot agree with all that is said to support that conclusion. Crimaldi's statement contains impeachment material that the defense did not already have. Even if the defendant and his attorney suspected that Crimaldi had been a "juice collector," actual proof of this fact was necessary for effective and ethical impeachment. Such proof is contained in Crimaldi's statement, and had defense counsel been aware of it he might have been in a position to employ a different "trial strategy." I believe that Crimaldi's admissions concerning his criminal activity could have been used to impeach his testimony to a much greater degree than was done.

I agree with the finding of harmless error, however, because I believe that Crimaldi's credibility was not a crucial factor. As Judge Cummings demonstrates, his story was fully corroborated by tape recordings or testimony of governmental agents. The prosecutor in the initial portion of his closing argument practically conceded Crimaldi's unreliability. Instead, he asked the jury to consider all of the other evidence which, in my opinion, is overwhelming. I am convinced that this is what impressed the jurors and that full knowledge of Crimaldi's activities would not have influenced their verdict. Accordingly, I join in the affirmance.

I am compelled, however, to register my disquietude with the Government's withholding of this tape. Perhaps persons with criminal backgrounds such as Crimaldi's must be employed by governmental agencies. But at least both the agency and the prosecutors should take particular care in discovering all statements and information relating to such informants that should be given to defense counsel. The use of such witnesses puts this special burden on the prosecutor. Lack of communication between sections of the Justice Department and poor memories of governmental agents are weak excuses. To me the Government's thoughtless, cavalier conduct in this case comes to the very brink of requiring reversal.

The use of informants such as Crimaldi who have an admitted extensive, serious, and unpunished criminal background is a questionable practice to begin with, in my opinion. The failure of the Government to make the information in Crimaldi's statement available to the trial judge *in camera* (as the Government now concedes was its duty), additionally makes my vote for an affirmance a reluctant one.