Wilbur CAREY, Petitioner-Appellant,

v.

Jack Raymond DUCKWORTH, and
Indiana Attorney General,
Respondents-Appellees.

No. 83–1024.

United States Court of Appeals,
Seventh Circuit.

Submitted March 29, 1984.*

Decided July 9, 1984.

---

* After preliminary examination of the briefs, the court notified the parties that it had tentatively concluded that oral argument would not be helpful to the court in this case. The notice provided that any party might file a "Statement as to Need of Oral Argument." *See* Rule 34(a), Fed.R.App.P.; Circuit Rule 14(f). No such statement having been filed, the appeal has been submitted on the briefs and record.

Wilbur Carey, pro se.

David A. Nowak, Deputy Atty. Gen., Indianapolis, Ind., for respondents-appellees.

Before PELL, WOOD and COFFEY, Circuit Judges.

COFFEY, Circuit Judge.

■■■ *Pro-se* petitioner-appellant Wilbur Carey was convicted of two counts of dealing in a controlled substance, heroin, and was sentenced to a term of 20 years. The Indiana Supreme Court unanimously affirmed the conviction. *Carey v. State,* 416 N.E.2d 1252 (Ind.1981). Having exhausted his state remedies, the petitioner filed a federal habeas petition, arguing that his due process rights were violated by prosecutorial misconduct.[1] We affirm the dismissal of the habeas petition.

The facts are fully set forth in the state court and district court opinions. Suffice it to say that the Indianapolis Police Department (IPD) and the Federal Drug Enforcement Administration (DEA) were jointly engaged in an extensive investigation of drug trafficking in Indianapolis. Apparently both agencies suspected that petitioner Carey was heavily involved, and they arranged a "controlled buy" in order to test this suspicion. An informant named Stacy Shields placed a telephone call to Carey, and the two agreed to meet in a shopping center parking lot at which time Shields would purchase heroin from Carey. Two IPD officers and one DEA agent were present in the hotel room when Shields placed the telephone call, and one officer monitored and recorded the conversation. After the call, and before the controlled buy, Shields was strip-searched and his car was searched. He was then given the money for the buy, and he drove off to the parking lot. Police and federal agents kept him under surveillance. The drug transaction was videotaped, and the conversation between Carey and Shields was monitored by means of a small transmitter carried in Shields' pocket. After the transaction, Shields, still under surveillance, returned to the hotel where the officers took the newly-purchased heroin from him, and again strip-searched him and searched his car. The same scenario was repeated on a second occasion (hence the two counts to the indictment).

At trial, the DEA agents and officers testified as to what they heard and observed during the transactions between Shields and Carey, and the tape recordings of the phone conversations were played for the jury. (The videotape turned out to be unusable.) In view of this evidence, Shields' corroborating testimony would seem at best cumulative. The petitioner nevertheless argues that Shields' testimony was crucial, and that prosecutorial misconduct prevented the jury from adequately assessing Shields' (lack of) credibility. The petitioner initially argues that the prosecution failed to inform the defense or the jury that Shields served as an informant only in exchange for a deal with the DEA. The failure to disclose this potentially exculpatory information is alleged to violate *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). Second, the petitioner argues that the prosecutor knowingly allowed Shields to perjure himself on the stand.

---

**1.** On appeal, petitioner raises an additional issue never presented below: whether his right to an appeal was denied when the Indiana Supreme Court did not allow for the withdrawal of the appeal with a chance to resubmit. We will not consider a matter raised for the first time on appeal. We also note that the lower federal courts do not sit in review of state supreme courts, and that habeas is not the appropriate vehicle for arguing that a conviction might have been overturned had subsequent proceedings been different.

■ *Brady v. Maryland,* as clarified by *United States v. Agurs,* 427 U.S. 97, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976), holds that the prosecution has a duty to disclose material exculpatory evidence, and that reversible error has occurred if the prosecution has failed to disclose such "material" evidence. "The mere possibility that an item of undisclosed information might have helped the defense, or might have affected the outcome of the trial, does not establish 'materiality' in the constitutional sense." *Agurs,* 427 U.S. at 109–10, 96 S.Ct. at 2400–01. "Material" evidence is that which "creates a reasonable doubt that did not otherwise exist." *Id.* at 112, 96 S.Ct. at 2401. The significance of the omission must be evaluated in the context of the entire record.

■ Thus, in evaluating petitioner Carey's claim, we must consider whether the prosecutor had a duty to disclose the deal between Shields and the DEA, and whether the disclosure of this information would have created a reasonable doubt that would not otherwise exist in the minds of the jurors. We conclude that under the materiality standard of *Agurs,* the omitted information was not material. According to testimony given outside the presence of the jury, Shields (who had no previous drug-related convictions) had arranged for the sale of heroin to someone who turned out to be an undercover DEA agent, one "Baby" Hayes. When the identity of the purchaser was revealed to Shields by other agents, he was told that in exchange for his services as an informant, the agents would "put in a good word for him" with the U.S. Attorney. Apparently nothing more definite was promised. Although the terms of this "deal" were never explained to the jury in so many words, the jury was adequately informed that Shields was heavily involved in drug trafficking and that he was induced to testify because the DEA agents had a "hammer" on him; he had previously arranged for the sale of heroin to an under-

cover DEA agent but had not yet been charged. As one agent testified, the ideal informant is one who is heavily involved but has no prior convictions; he can be easily "flipped" by implicitly or explicitly holding the threat of prosecution over his head. It was explained to the jury (in case they had not figured it out) that Shields was strip-searched before and after the controlled buys because of the possibility that as a known drug dealer, he might introduce his own merchandise into the transaction. Testimony also showed that Shields received money for minor living expenses from the DEA. In short, Shields was not exactly presented to the jury as a model citizen. Additional information about his deal could not have undermined Shields' credibility enough to create a reasonable doubt about Carey's guilt.

■ In view of our conclusion about the immateriality of this omitted information, we need not decide whether the prosecutor was under a duty to disclose the information. The question is an interesting one, because it is clear that the prosecutor was totally unaware of the deal until it was disclosed during testimony on the second day of trial.[2] (At that point a hearing was held outside the presence of the jury, and the terms detailed above were revealed.) The prosecutor had apparently taken Shields at his word when he told her that he had never sold heroin to anyone (he didn't consider arranging a deal to be equivalent to selling). The DEA agent explained that he hadn't mentioned the deal to the prosecutor because he didn't consider it relevant to a state prosecution. From defense counsel's carefully-worded testimony, it may be inferred that he knew something about a deal, and the only new piece of information revealed on the second day of trial was the name of the DEA agent for whom Shields had arranged a purchase. Although the prosecutor was more in the dark than anyone else, that is not necessarily enough to relieve her of a

---

**2.** This is only the largest of the numerous surprises that occurred at trial. The transcript reads more like a dress rehearsal than a trial at

which both sides have their evidence in hand and know what to do with it.

*Brady* obligation; a prosecutor's office cannot get around *Brady* by keeping itself in ignorance, or compartmentalizing information about different aspects of a case. In *Giglio v. United States*, 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972), one assistant U.S. Attorney promised immunity to a witness, but failed to tell another assistant in the same office who tried the case and stated in summation that no promises had been made to the witness. While the Supreme Court agreed that the assistant was not dishonest in his summation, the prosecutor's office was held to be an entity, with a promise made by one attributable to all. The Court went on to note that this standard might present practical problems in a large prosecutor's office, but that that was simply unavoidable. In this case we do not need to decide whether DEA, the police, and the state prosecutor can all be charged with constructive knowledge of each other's arrangements.[3] However, joint state-federal drug investigations are quite common, and prosecutors should give some thought to these potential problems of coordination.[4] Being forewarned, they should not simply assume that they have no responsibility for keeping abreast of decisions made by other members of the team. In any event, it certainly behooves a prosecutor to inquire closely into the circumstances of the use of an informant. On the face of it, it seems inherently implausible that an informant would submit to a strip search before and after a controlled buy if there were not an element of compulsion to his participation.

 As to the question of allegedly perjured[5] testimony, four specific instances are cited: Shields testified that 1) he never sold heroin to anyone, 2) he never delivered heroin to Agent Hayes 3) the DEA had promised him nothing, and 4) when he placed the telephone calls to Carey, one IPD officer was present (two other agents were there as well). After a careful review of the record, we are convinced that while the cited instances of testimony were somewhat misleading, none were actually false. Perjury is the willful assertion under oath of a false, material fact. The record discloses a misunderstanding between the parties as to certain facts in this case; however, the record fails to disclose any evidnece that approaches knowingly false testimony. Therefore, we are unable to understand the state's concession that there was perjury.

The question concerning the number of agents in the room when the telephone call was made is of very minor significance, and besides, Shields never claimed that only the IPD officer was present; twice he gave a single name in response to a question about who was present, but no follow-up questions were used to determine whether Shields had given a complete answer. The answer concerning promises from the DEA is a similar half-truth; the only promise—that the DEA agents would put in a good word for him—was rather insubstantial. While Shields might have been more forthcoming in his testimony, neither can he be charged with defense counsel's failure to ask penetrating questions on cross examination.

The other two alleged instances of perjury concern Shields' role in the drug trade. Again, we conclude that there was no perjury. The supposed inconsistencies between the versions offered by Shields and

3. In *United States ex rel. Clauser v. McCevers*, 731 F.2d 423 (7th Cir.1984), a double jeopardy case, this court refused to attribute a police officer's perjury to the prosecutor. Defendant's first trial was terminated when it became apparent that the indictment was defective; unknown to the prosecutor, a police officer had given false testimony to the grand jury. Defendant was reindicted and convicted, and filed a habeas petition arguing that the officer's perjury should be attributed to the prosecutor and thus should have barred a retrial.

4. Coordination was a problem in other respects as well. For example, FBI rap sheets were not readily available.

5. *Black's Law Dictionary* (4th ed.) defines perjury as "the willful assertion as to a matter of fact, opinion, belief, or knowledge, made by a witness in a judicial proceeding as part of his evidence, ... such assertion being material to the issue or point of inquiry and known to such witness to be false."

the DEA agents, in our opinion, are largely semantic. The agents described Shields as a drug dealer who "sold" drugs to Agent Hayes and others, while Shields adamantly maintained that he did not sell or distribute heroin. Rather, he prided himself on being only a courier or a middleman; he accepted orders and money from those wishing to purchase heroin, found a supplier, arranged for someone to make the delivery, and kept a portion of the money for his brokerage services. This does not amount to willful false testimony on the part of Shields. There is a difference between consummating a sale where the party himself acquires ownership of the property, and arranging a sale where the party acts merely as a liaison between two other parties. Business terminology aside, Shields' description of his activities is perfectly consistent with the DEA agents' bottom-line conclusion that Shields "sold" heroin.

We conclude that there is no record evidence to suggest that Carey's conviction was obtained either through a failure to disclose *Brady* material or through the use of perjured testimony. The judgment of the district court dismissing the habeas petition is therefore AFFIRMED.