UNITED STATES of America ex rel. Lawrence SMITH, Petitioner-Appellee, Cross-Appellant,

v.

James W. FAIRMAN and Neil F. Hartigan, Respondents-Appellants, Cross-Appellees.

Nos. 84–2731, 84–2829.

United States Court of Appeals, Seventh Circuit.

Argued Jan. 14, 1985.

Decided July 22, 1985.

Kenneth N. Flaxman, Chicago, Ill., for Fairman and Hartigan.

Kenneth A. Fedinets, Asst. Atty. Gen., Chicago, Ill., for the U.S. ex rel. Smith.

Before BAUER, CUDAHY and FLAUM, Circuit Judges.

FLAUM, Circuit Judge.

Respondents appeal from the district court's order granting petitioner Lawrence Smith's petition for a writ of habeas corpus on the ground that the State violated the dictates of *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), by failing to provide petitioner with a police firearms worksheet prior to his trial. Petitioner, seeking a complete reversal of his conviction rather than the new trial ordered by the district court, appeals from the district court's conclusion that the State's evidence was not insufficient to establish petitioner's guilt beyond a reasonable doubt. We affirm.

## I.

### A. The Trial

On January 27, 1974, the petitioner was arrested by two Chicago police officers, Officers Pooler and Martis. He was subsequently indicted on two counts of aggravated battery, one count of attempted murder, and one count of attempted armed robbery. At petitioner's state bench trial before Judge Watt on March 14, 1978, the two officers testified to the following series of events leading to petitioner's arrest: while on patrol at approximately 5:45 p.m. on January 27, 1974, the officers observed petitioner holding a gun to the head of a man named Arthur Bell. Bell was standing half in and half out of the cab of a truck parked at the curb. Believing that they were witnessing an armed robbery, the officers parked in an alley, got out of

their car, and approached the truck. Officer Martis went around the back of the truck and Officer Pooler started to go around the front. As Pooler stopped to detain and search a third man coming toward him around the front of the truck, he heard Martis shout "police officers, drop your gun" and heard two shots fired. Pooler went around the front of the truck, holding the third man by the arm with his left hand and holding his gun in his right hand, and observed petitioner (with his back to Pooler) shooting at Officer Martis. Martis fell to the ground, returning petitioner's fire, and told Pooler "get him, Richie." Pooler then shot at petitioner, whereupon petitioner spun around and pointed his gun at Pooler. Pooler fired two more shots, causing petitioner to spin around in an evasive maneuver. When petitioner again pointed his gun at Pooler, Pooler fired two more shots, and petitioner fell to the ground. Martis then came over to wrestle the gun away from petitioner. Pooler held the third man by the arm throughout the entire episode.

Arthur Bell, the alleged victim, died prior to trial and therefore did not testify. The State's only witness other than Officers Pooler and Martis was Ella Springer, a bystander who testified that as she was crossing the street in the vicinity of the truck, she heard a man's voice say "man, I don't have any money." Moments later she heard a voice say "police officer, drop your gun." She then heard a shot fired, looked over toward the truck, saw three black men standing by the truck, and saw a police officer fall to the sidewalk. She then ran from the scene. When she returned, a crowd had gathered and she could see a man lying on his stomach on the sidewalk, bleeding from the buttocks. She did not see who fired the shots, did not see a gun, and could not identify petitioner either as one of the three black men standing near the truck or as the person she later saw lying on the ground. This concluded the State's case.

Petitioner testified to a completely different version of the incident: on the evening

of January 27, 1974, he had been drinking and talking with four friends on the sidewalk. One of the men had a gun that he was trying to sell for $20. Petitioner examined the gun for a few minutes, removing the magazine and taking all of the bullets out of the magazine. As he was looking at the gun, two of his friends wandered away, leaving only three men standing on the sidewalk. Petitioner did not remember observing any truck parked at the curb. Petitioner testified that he tried to get his friend to give him the gun for free, saying "man, I don't have any money." He was loading the bullets back into the magazine when he heard someone shout "police officers, drop your gun." He threw the gun down and started to run, still holding the remaining bullets. Petitioner heard five shots before being hit in the back of the leg, approximately one inch above his knee. After he fell to the ground, Officer Martis ran over and kneeled on petitioner's leg. When petitioner protested that Martis was kneeling on petitioner's wound, Martis said that he knew what he was doing, called petitioner names, stood up, and deliberately shot petitioner in the buttocks. Petitioner was hospitalized for six months as a result of the shooting. He underwent a colostomy while in the hospital and suffered permanent nerve damage to his leg. The State did not contradict or rebut petitioner's testimony as to his wounds.

The gun that was recovered from the scene was later inventoried and found to contain five unspent cartridges in its magazine. Three unspent bullets were found in petitioner's pants pocket. Petitioner testified that the gun would hold a total of eight bullets, while Officer Pooler testified that, to his knowledge, the gun would hold ten or eleven. Officer Martis testified that petitioner fired a total of three or four shots at him.

Judge Watt found petitioner not guilty of aggravated battery, guilty of attempted murder, and guilty of attempted armed robbery. He sentenced petitioner to concurrent terms of four to twelve years for the attempted armed robbery and eight to fifteen years for the attempted murder.

## B. Post-Conviction Proceedings

On direct appeal, petitioner argued that there was insufficient evidence to sustain his conviction on either charge and that he was denied effective assistance of counsel. The state appellate court rejected these arguments and affirmed his convictions. *People v. Smith*, 81 Ill.App.3d 764, 36 Ill. Dec. 879, 401 N.E.2d 1017 (1980).

On January 30, 1979, while his direct appeal was pending, petitioner filed a motion for post-conviction relief in the trial court pursuant to Ill.Rev.Stat. ch. 38, § 122 (1979). The motion was based upon petitioner's discovery that the police had prepared, the day after the incident leading to his arrest, a firearms worksheet indicating that the gun petitioner was supposed to have fired at the police officers was in fact inoperable. Petitioner's motion for post-conviction relief was granted, and a hearing was held on February 26, 1981, before Judge Schreier.

Two witnesses testified at the post-conviction hearing. The first was Officer Robert Smith, a ballistics officer with the Chicago Police Department. Officer Smith testified that on January 28, 1974, the day after the alleged shooting, he examined the gun in question and found that it was inoperable. His worksheet stated that the "trigger extension bar" was damaged and did not "engage [the] sear." In order to test fire the gun, he had to trip the sear with a screwdriver. In Smith's opinion, the gun's inoperability could conceivably have been caused either by wear and tear or by being dropped. Smith further testified that he found some residue in the muzzle of the gun, indicating that the gun had been fired since it was last cleaned, but could not determine when the gun had last been fired. Smith noted all of these observations on a firearms worksheet but then put the worksheet in his files. He did not include the fact of the gun's dysfunction on his official report, filed on February 5, 1974, because the only bullets found at the

scene had been fired from Officer Pooler's gun. Smith testified that it was departmental procedure only to report the results of a match between the bullets recovered from the scene of a crime and the guns submitted for testing.[1]

The second witness to testify at petitioner's post-conviction hearing was Professor Joseph D. Nicol, a firearms expert who examined the gun in March 1980 and also concluded that it was inoperable. Nicol testified, however, that the gun's inoperability was due solely to wear and tear on critical internal parts, not to the gun's being dropped. He testified that "many repeated actions" had worn down the inside surfaces of the gun such that they no longer engaged. In addition, he found no evidence of broken or damaged parts. Nicol further testified that if he found a gun with five unspent cartridges in its magazine and none in the chamber, he would conclude that it had not been fired because upon firing, one of the bullets in the magazine would have dropped into the chamber for the next shot.

At the conclusion of the hearing, Judge Schreier reversed petitioner's conviction for attempted murder, concluding that the evidence presented at the hearing raised a reasonable doubt as to petitioner's guilt. Judge Schreier let stand petitioner's conviction for attempted armed robbery, however, on the basis that "even an inoperable gun" could be used to commit an armed robbery under Illinois law and that evidence of the gun's inoperability therefore would not affect the validity of that conviction. In response to petitioner's argument that the new evidence proved that the officers had lied on the stand and consequently that none of their testimony should be believed, the court stated that "any witness can be believed on one aspect and disbelieved on another aspect."

On appeal, the state appellate court affirmed Judge Schreier's decision to sustain petitioner's attempted armed robbery con-

viction, stating in an unpublished order that

> the expert testimony presented at the post conviction hearing demonstrated that defendant's weapon had not been fired and could not have been fired on the date of the offense. We do not believe, however, that the officers' erroneous testimony regarding the circumstances surrounding the attempted murder offense requires reversal of defendant's conviction for attempted armed robbery.

*People v. Smith*, 111 Ill.App. 1163, 74 Ill. Dec. 301, 455 N.E.2d 574, slip op. at 3 (1982). The appellate court's rationale was the same as Judge Schreier's—that a trier of fact could have believed the officers' testimony that petitioner had held a gun to Bell's head and that such action constituted an attempted armed robbery under Illinois law regardless of the gun's operability. The Illinois Supreme Court denied further review.

## C. Habeas Corpus Proceedings

Petitioner filed a petition for a writ of habeas corpus in federal district court on January 13, 1984, pursuant to 28 U.S.C. § 2254 (1982). Petitioner argued that (1) there was insufficient evidence to sustain his attempted armed robbery conviction since no rational trier of fact could believe the officers' testimony that he held a gun to Bell's head once it was shown that the officers lied under oath, and (2) the State violated petitioner's due process rights under *Brady v. Maryland* when it failed to disclose Officer Smith's firearms worksheet to petitioner prior to trial. The district court first concluded that it was reluctant to grant the writ on sufficiency of the evidence grounds since it was unable to determine whether the state courts had actually made a factual finding that the officers had perjured themselves when they testified that petitioner had fired at them. *United States ex rel. Smith v. Fairman*, No. 84 C 268, slip op. at 11 (N.D.Ill. Sept. 27, 1984). The district court nevertheless granted petitioner's writ on

---

1. The Assistant State's Attorney assured Judge Schreier that he had advised the chief of the

Police Department's ballistics division to change this practice.

the basis of the State's *Brady* violation, *id.* at 15, and this appeal followed.

## II.

### A. Failure to Disclose Exculpatory Evidence

■ The Supreme Court held in *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Id.* at 87, 83 S.Ct. at 1197. Evidence material to guilt is any evidence that "would tend to exculpate" the accused. *Id.* at 88, 83 S.Ct. at 1197. This definition includes evidence affecting the credibility of prosecution witnesses when the reliability of those witnesses may be determinative of guilt or innocence. See *United States v. Bagley,* —— U.S. ——, ——, 105 S.Ct. 3375, 3379, 87 L.Ed.2d 481 (1985); *Giglio v. United States*, 405 U.S. 150, 154–55, 96 S.Ct. 763, 766, 31 L.Ed.2d 104 (1972); *United States v. Navarro*, 737 F.2d 625, 631 (7th Cir.), *cert. denied,* —— U.S. ——, 105 S.Ct. 438, 83 L.Ed.2d 364 (1984).

■ Officer Smith's firearms worksheet was clearly exculpatory evidence within the meaning of *Brady*. The worksheet, prepared the day after the alleged shooting, indicated that the gun petitioner was supposed to have fired at the police officers was inoperable, at least at the time of its examination. This evidence certainly would have cast doubt on the credibility of Officers Pooler and Martis, the key prosecution witnesses.

■ The prosecutor's ignorance of the existence of Officer Smith's worksheet does not justify the State's failure to produce it, since *Brady* provides that the good faith or bad faith of the prosecution is irrelevant to the due process inquiry. See *Brady*, 373 U.S. at 87, 83 S.Ct. at 1196; *United States v. Agurs*, 427 U.S. 97, 110, 96 S.Ct. 2392, 2400, 49 L.Ed.2d 342 (1976) (whether the suppression of evidence results in constitutional error depends upon the character of the evidence, not the character of the prosecutor). *Cf. United States v. Esposito*, 523 F.2d 242, 248–49 (7th Cir. 1975) (good faith of prosecutor relevant only insofar as special benefit of the doubt on the question of materiality should be given to a defendant when the prosecutor's failure to reveal evidence is *not* in good faith), *cert. denied*, 425 U.S. 916, 96 S.Ct. 1517, 47 L.Ed.2d 768 (1976). This may be especially true when the withheld evidence is under the control of a state instrumentality closely aligned with the prosecution, such as the police. *See Barbee v. Warden, Maryland Penitentiary*, 331 F.2d 842, 844, 846 (4th Cir.1964) (holding that nondisclosure of police ballistics and fingerprint tests violated defendant's due process rights even though there was no evidence that the prosecutor was aware that the reports existed); *cf. Giglio v. United States*, 405 U.S. at 154, 92 S.Ct. at 766 (nondisclosure, whether by negligence or design, of an agreement between one assistant U.S. attorney and a prosecution witness is the responsibility of the prosecuting attorney even if completely unaware of the agreement).[2] We believe that the purposes of *Brady* would not be served by allowing material exculpatory evidence to be withheld simply because the police, rather than the prosecutors, are responsible for the

---

2. The two cases in which this court has declined to impute police knowledge to the prosecution involved readily distinguishable factual situations. *See United States ex rel. Clauser v. McCevers*, 731 F.2d 423, 431 (7th Cir.1984) (declining to attribute police misrepresentations before the grand jury—which resulted in the termination of petitioner's first trial—to the prosecution in petitioner's second trial for purposes of reversing his conviction on double jeopardy grounds); *Carey v. Duckworth*, 738 F.2d 875, 877–78 (7th Cir.1984) (declining to decide whether a *state* prosecutor should be held responsible for knowledge of *federal* law enforcement agents). *Cf. United States v. Walker*, 720 F.2d 1527, 1535 (11th Cir.1983) (refusing to impute knowledge of *state* officials to *federal* prosecutor), *cert. denied,* —— U.S. ——, 104 S.Ct. 1614, 80 L.Ed.2d 143 (1984).

nondisclosure. *See Carey v. Duckworth,* 738 F.2d 875, 878 (7th Cir.1984) ("a prosecutor's office cannot get around *Brady* by keeping itself in ignorance, or [by] compartmentalizing information about different aspects of a case.") Because *Brady* was aimed at ensuring that an accused receives a fair trial rather than punishing the prosecutor for failing to disclose exculpatory evidence, *see Bagley,* —— U.S. at ——–——, 105 S.Ct. at 3379–81; *Brady,* 373 U.S. at 87–88, 83 S.Ct. at 1196–97, the prosecution's "constitutional obligation [to disclose] is [not] measured by the moral culpability, or the willfulness, of the prosecutor." *Agurs,* 427 U.S. at 110 & n. 17, 96 S.Ct. at 2400 & n. 17. *See also Smith v. Phillips,* 455 U.S. 209, 219–20, 102 S.Ct. 940, 947, 71 L.Ed.2d 78 (1982) (essence of *Brady* and *Agurs* is the fairness of the trial, not the culpability of the prosecutor). The fact that the prosecutor in this case was blameless therefore does not justify the State's failure to produce Officer Smith's firearms worksheet.

▇▇▇▇ Having concluded that the State withheld exculpatory evidence from petitioner, we must next determine whether petitioner's due process rights were thereby violated. In *Agurs,* the Supreme Court set forth the standards used in three different factual situations in which a post-trial discovery is made of information that was known to the prosecution but unknown to the defense at trial. In the first situation, the undisclosed evidence demonstrates that

the prosecution's case included perjured testimony and that the prosecutor knew, or should have known, of the perjury. 427 U.S. at 103, 96 S.Ct. at 2397. In such a case, the conviction must be set aside "if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury." *Id.*[3] The second situation involves a pretrial request for specific evidence, which the prosecution then fails to produce. In this second scenario, illustrated by the facts in *Brady,* the petitioner need only show that the withheld evidence "might have affected the outcome of the trial." *Agurs,* 427 U.S. at 104–06, 96 S.Ct. at 2397–98. The third and last factual situation is illustrated by *Agurs* itself—a nonspecific pretrial request for "anything exculpatory," "all *Brady* material," or no request at all. *Id.* at 106–07, 96 S.Ct. at 2398–99. In this last situation, the petitioner carries a heavier burden of showing that the nondisclosed evidence "creates a reasonable doubt that did not otherwise exist." *Id.* at 112, 96 S.Ct. at 2402.[4]

The district court held that the second test in *Agurs* applied to the facts of this case after finding that petitioner made a specific pretrial request for the firearms worksheet.[5] We find it unnecessary to decide, however, whether petitioner's request for the results of any "scientific tests, experiments or comparisons" constituted a specific or a general request under *Agurs* for two reasons: first, we believe that the nondisclosed evidence was material under

---

3. Although petitioner argues that Officers Pooler and Martis perjured themselves at trial, he does not contend that this first standard applies, perhaps because of the burden of proving that the prosecutor knew, or should have known, of the perjury.

4. The State invites us to create a fourth standard, as the Fifth Circuit has done, for cases involving a general request for purely impeaching evidence. *See Garrison v. Maggio,* 540 F.2d 1271, 1274 (5th Cir.1976) (defendant must show that new evidence "probably would have resulted in an acquittal"), *cert. denied,* 431 U.S. 940, 97 S.Ct. 2655, 53 L.Ed.2d 258 (1977). For the reasons stated by this circuit in *Ruiz v. Cady,* 635 F.2d 584 (7th Cir.1980), however, we reject this distinction between different types of exculpatory evidence. *See id.* at 586–87 & n. 2. *See*

*also United States v. Bagley,* —— U.S. ——, ——, 105 S.Ct. 3375, 3379, 87 L.Ed.2d 481 (1985) (rejecting distinction between impeachment evidence and other exculpatory evidence for purposes of *Brady*).

5. On December 27, 1974, petitioner filed a three-page motion for discovery asking the prosecution to produce, *inter alia,* "[a]ny reports or statements of experts, made in connection with the instant case, including, but not limited to, results of physical or mental examinations and of scientific tests, experiments or comparisons." Petitioner further requested that the State be ordered "to use diligent good faith efforts to secure for the defense any material or information ... which is in the possession or control of other governmental personnel."

either the second or third *Agurs* tests, and second, the Supreme Court's recent decision in *United States v. Bagley,* — U.S. ——, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985), suggests that there is now a single standard of materiality—whether there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the trial would have been different. *Id.* at ——, 105 S.Ct. at 3384 (Blackmun and O'Connor, JJ.); *id.* at —— – ——, 105 S.Ct. at 3384–85 (White, J., Burger, C.J., and Rehnquist, J., concurring). A "reasonable probability" is a probability sufficient to undermine confidence in the outcome. *Id.* at —— – ——, 105 S.Ct. at 3383. Regardless of how the test is phrased, we hold that the nondisclosed firearms worksheet was material to petitioner's trial.

Two versions of the events leading to petitioner's arrest on January 27, 1974, were presented at trial. One was related by Officers Pooler and Martis, the other by petitioner. The only other witness was Ella Springer, whose testimony was not inconsistent with either rendition. The physical evidence, if anything, tended to support petitioner's account; the only bullets found at the scene had been fired from Officer Pooler's gun, the gun allegedly fired by petitioner contained five unspent bullets in its magazine but none in the firing chamber, and petitioner was shot twice from the rear, whereas Officer Pooler testified that he shot petitioner as petitioner was facing him. What the trial boiled down to, therefore, was the two police officers' word against petitioner's—a credibility contest.

The firearms worksheet, which showed at the least that the gun was inoperable the day after the alleged shooting, certainly raises a significant doubt as to the officers' credibility. Furthermore, had petitioner been aware of the report, he could have had the gun tested more extensively, as he did in 1980 when he asked Professor Nicol to examine the gun, in an attempt to demonstrate that the officers in fact perjured themselves when they testified that petitioner had fired a gun at them that eve-

ning. We believe both that this evidence creates a reasonable doubt as to petitioner's guilt that did not otherwise exist and, stated in terms of the *Bagley* standard, that there is a reasonable probability that the result of petitioner's trial would have been different had petitioner been aware of the worksheet. We therefore conclude that under any standard of materiality, the State's nondisclosure of the worksheet, even if unintentional, violated petitioner's due process rights under *Brady v. Maryland.* We accordingly affirm the district court's grant of petitioner's writ of habeas corpus on *Brady* grounds.

## B. Sufficiency of the Evidence

The standard of habeas review on petitioner's claim that he was convicted of attempted armed robbery in state court on insufficient evidence is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979). Petitioner argues that the state courts made a factual finding, which we must presume correct under 28 U.S.C. § 2254(d) (1982), that the gun allegedly used by petitioner to shoot at Officer Martis was in fact inoperable, and that the officers thus perjured themselves when they testified that petitioner had fired multiple shots at them. Since the officers committed perjury in at least one very significant aspect of their testimony, petitioner asserts, their testimony as to petitioner's attempted armed robbery could not be believed by any rational trier of fact. Without the officers' testimony, the only remaining testimony was that of Ella Springer, who heard a man say "man, I don't have any money," but could not identify petitioner and saw no gun. Even when viewed in the light most favorable to the prosecution, petitioner concludes, no rational trier of fact could have found petitioner guilty of attempted armed robbery beyond

a reasonable doubt based on this meager testimony.

Respondents argue that a rational trier of fact could have believed Officer Pooler's testimony that he saw petitioner holding a gun to the head of Arthur Bell and that, in conjunction with Ella Springer's testimony that she heard a man say "man, I don't have any money," petitioner could have been found guilty beyond a reasonable doubt of attempted armed robbery under Illinois law.

The first step in our analysis is to determine whether the state courts indeed found, as petitioner asserts, that the gun was inoperable on the ·day of the alleged shooting. If so, that factual finding is entitled to a presumption of correctness under section 2254(d).[6] A review of the record in this case leads us to conclude that the state courts did not make a factual determination within the meaning of section 2254(d) that the gun in question was inoperable on the day of the alleged shooting.

In petitioner's post-conviction hearing, Judge Schreier heard the testimony of two firearms experts, Officer Smith and Professor Nicol. Both witnesses agreed that the gun was inoperable when it was received by Officer Smith the day after the alleged shooting. Smith testified that the gun's dysfunction could have been caused either by wear and tear or by being dropped. Nicol testified that the only cause of the gun's malfunction was wear and tear on critical internal parts. He found no sign of broken or damaged parts. After hearing this testimony, Judge Schreier reversed petitioner's conviction for attempted murder. It is difficult to discern from the hearing transcript, however, whether Judge Schreier did so because he found that the gun was in fact inoperable at the time of the alleged shooting or because he decided that the new evidence simply raised a reasonable doubt as to the gun's operability, and thus as to petitioner's guilt on the attempted murder charge.[7]

---

**6.** Section 2254(d) provides that

[i]n any proceeding instituted in a Federal court by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination after a hearing on the merits of a factual issue, made by a State court of competent jurisdiction in a proceeding to which the applicant for the writ and the State or an officer or agent thereof were parties, evidenced by a written finding, written opinion, or other reliable and adequate written indicia, shall be presumed to be correct....

28 U.S.C. § 2254(d) (1982).

**7.** For instance, Judge Schreier reversed petitioner's conviction for attempted murder because

[t]here was a violation of due process it seems to me which would have led to a reasonable doubt on the attempt murder of the police officers because of the *really undisputed scientific testing which indicated the gun was inoperable, at least at the time of the examination.* (Emphasis added). The following week, the State filed a motion for reconsideration on the attempted murder charge, asking the court to simply vacate the conviction and order a new trial rather than reversing the conviction outright. Judge Schreier denied that motion, stating that there was no question in his mind but that the initial factfinder, if presented with the new evidence, would have found petitioner not guilty of attempted murder:

[T]here is no question in my mind that if the trier of the facts during the initial trial ... was presented with evidence that the gun upon which the State relied in proving their attempt murder count *was in fact at the time of the examination inoperable* ... there is no question in my mind that the trier of facts would have found Mr. Smith not guilty.

(Emphasis added). Moments later, the judge stated that

I think ... because of the theory of the State's case that the defendant shot at the police officer and the theory being that the gun was certainly operable because it did the shooting, and then later in the newly discovered evidence conceded by both Police Officer Smith from the Ballistics Division and Professor Nichole [*sic*] was in fact inoperable that in every way the defendant was unfairly convicted of the attempt murder. This is not just some inadmissible evidence, some violation pertaining to Miranda or Massiah or Mapp vs. Ohio, etc., this was the whole linchpin, the whole theory of the State's case that the defendant shot at the police officers, *and now it comes to me that in essense [sic] the gun with which he shot at the police officers was an inoperable gun.*

(Emphasis added). We agree with the district court that it is not clear from these oral statements whether Judge Schreier concluded that the gun was actually inoperable on the day of the alleged shooting or whether he merely con-

This difficulty is due in large part to the fact that Judge Schreier's only statements in regard to the gun's operability were made in the context of his legal conclusions—factual findings as such were never made either orally or in writing.[8] Because Judge Schreier never explicitly made the requisite factual findings, and because we are unable to determine from the record or from Judge Schreier's disposition of the case what his factual findings must have been, we conclude that it would be inappropriate to attach a presumption of correctness to any of Judge Schreier's oral statements regarding the gun's operability.

■ We now turn to the more difficult question—whether to defer to the state appellate court's written, unambiguous, factual finding that "the expert testimony presented at the post-conviction hearing demonstrated that defendant's weapon had not been fired and could not have been fired on the date of the offense." As the Supreme Court held in *Sumner v. Mata,* 449 U.S. 539, 101 S.Ct. 764, 66 L.Ed.2d 722 (1981), section 2254(d) is applicable to pertinent factual findings made by a state appellate court as well as by a trial court. *Id.* at 545–47, 101 S.Ct. at 768–69. Section 2254(d) requires, however, that the pertinent factual finding be made "after a hearing on the merits of a factual issue."

In *Sumner v. Mata,* the state appellate court heard and decided a factual claim that the petitioner had failed to raise before the trial court and that was squarely raised and argued before the appellate court. 449 U.S. at 546, 101 S.Ct. at 768. In this case, on the other hand, we are unable to determine from the record whether the state appellate court was presented with or considered the merits of the issue of whether the gun could have been fired

on the evening in question. All indications are that this issue was *not* presented to the state appellate court for decision, since the State's position on appeal (which the court adopted) was that petitioner could have attempted an armed robbery with an inoperable gun and thus that the gun's operability was irrelevant. We hesitate to assume, as we would be required to do, that the state appellate court's factual conclusion that the gun "had not ... and could not have been fired on the date of the offense" was made after a hearing on the merits of the issue, and are therefore reluctant to attach to the appellate court's statement the presumption of correctness otherwise required by section 2254(d).

■ Even assuming that the state courts did make a factual finding that the gun could not have been fired on the evening in question, moreover, we would not necessarily grant petitioner's writ of habeas corpus on sufficiency of the evidence grounds because we believe that a rational trier of fact could have believed Officer Pooler's testimony that he saw petitioner holding a gun to a man's head. Although we share the district court's indignation that police officers could have perpetrated such a fraud on the court, if indeed they were lying about the shooting, we also recognize that a rational trier of fact might nevertheless believe Officer Pooler's initial testimony in that it provides an explanation for why Officers Pooler and Martis stopped their car, sneaked up on petitioner, and shouted "police officers, drop your gun." If petitioner were indeed just standing around with several friends, chatting about a gun, the officers' method of approach might seem a bit unusual. A rational juror might suspect that the truth lay some-

---

cluded that a reasonable doubt existed as to the attempted murder charge in light of the gun's inoperability at the time of its examination.

**8.** Section 2254(d) states that the presumption of correctness attaches only to factual determinations "evidenced by a written finding, written opinion, or other reliable and adequate written indicia." Although no written findings or opinions were issued by Judge Schreier in this case,

we hesitate to conclude that section 2254(d) does not apply to Judge Schreier's oral statements for that reason alone in light of the Supreme Court's recent holding that a court reporter's transcription of a trial judge's oral findings can constitute "other reliable and adequate written indicia" for purposes of section 2254(d). *See Wainwright v. Witt,* — U.S. —, 105 S.Ct. 844, 855, 83 L.Ed.2d 841 (1985).

where in between the two accounts of the incident presented at trial—that Officer Pooler saw petitioner holding a gun to Arthur Bell's head; that when the officers approached, petitioner threw down the gun and began to run; that the officers shot petitioner as he ran away; and that they then invented the shooting incident to justify their use of force. We construct this scenario of events not to suggest that this is what actually happened, since we are in no position to make such a determination, but merely to suggest that a rational juror could have believed Officer Pooler's testimony that he saw petitioner holding a gun to a man's head notwithstanding petitioner's impeachment of the rest of Pooler's testimony.

In conclusion, we affirm the district court's decisions (1) not to grant petitioner's writ of habeas corpus on sufficiency of the evidence grounds, and (2) to grant petitioner's writ of habeas corpus on *Brady* grounds. We therefore affirm the district court's order vacating petitioner's attempted armed robbery conviction and ordering a new trial.