

1998 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

9-11-1998

# Hollman v. Wilson

Precedential or Non-Precedential:

Docket 97-2062

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_1998

Recommended Citation

"Hollman v. Wilson" (1998). *1998 Decisions.* Paper 228.
http://digitalcommons.law.villanova.edu/thirdcircuit_1998/228

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 1998 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

Filed September 11, 1998

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 97-2062

CHESTER HOLLMAN,
        Appellant

v.

HARRY E. WILSON, SUPERINTENDENT, RETREAT; THE
DISTRICT ATTORNEY OF THE COUNTY OF
PHILADELPHIA; THE ATTORNEY GENERAL OF THE
STATE OF PENNSYLVANIA

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
(D.C. No. 97-cv-2115)

Argued June 9, 1998

Before: STAPLETON, COWEN, and RENDELL,
Circuit Judges

(Filed: September 11, 1998)

        NORRIS E. GELMAN [ARGUED]
        The Public Ledger Bldg.
        6th & Chestnut Streets
        Philadelphia, PA 19106

        Counsel for Appellant

        DONNA G. ZUCKER [ARGUED]
        Office of the District Attorney
        1421 Arch Street
        Philadelphia, PA 19102-1582

        Counsel for Appellees

OPINION OF THE COURT

RENDELL, Circuit Judge.

Appellant, Chester Hollman, appeals from the district court's denial of his habeas petition filed pursuant to 28 U.S.C. S 2254, claiming that a violation of Brady v. Maryland, 373 U.S. 83 (1963), undermines his murder conviction. For the reasons discussed below, we will affirm.

Factual Background

On May 4, 1993, a Common Pleas Court jury in Philadelphia convicted Hollman of second-degree murder, possession of an instrument of crime, robbery, and criminal conspiracy for his involvement in the shooting death of Tae Jung Ho, a graduate student at the University of Pennsylvania. Ho had been walking with his girlfriend at 22nd and Sansom Streets in Philadelphia in the early morning of August 20, 1991, when the two were approached by Hollman and another man, who pushed Ho to the ground. Hollman restrained Ho by sitting on his legs while the other assailant shot Ho in the chest; he was killed instantly. Hollman then robbed Ho and the two men ran back to their vehicle, a white Chevy Blazer.

The evidence against Hollman included the testimony of Deirdre Jones who had been traveling with Hollman in the car that night. She testified that she had been driving around Center City with Hollman and two other individuals, a man and a woman. The two men stopped the car and discussed their plan to rob someone; Jones was instructed to act as a "lookout." The two men then left the car. Jones heard a gunshot and the two men jumped back into the vehicle and sped away. Shortly thereafter, the two

2

other passengers exited the car and Hollman and Jones continued driving.

Two other witnesses near the scene testified that they heard a gunshot and saw two men jumping into a white Chevy Blazer which contained two passengers. One witness, a taxi driver, followed the car and was able to read the first few letters of the license plate, "YZA" before losing the car in traffic. The driver reported what he had seen and gave a description of the vehicle. Shortly thereafter, a Philadelphia police officer stopped the car driven by Hollman within blocks of the crime scene. It matched the taxi driver's description and bore a license plate which started with the letters "YZA." As the officer questioned and searched Hollman he observed that Hollman was perspiring heavily and seemed highly agitated.

At trial, the only eyewitness who claimed to have actually seen the crime in progress was Andre Dawkins. Dawkins was standing outside a convenience store across the street from the crime scene. He testified that he saw Hollman and another man push Ho to the ground and heard Ho plead for his life and the life of his girlfriend. Dawkins claimed to have had a good view of Hollman running back to the car after the shooting and identified Hollman as the man who had restrained Ho while the other assailant shot him.

During his interview with the police, Hollman denied everything. However, when confronted with the statement of Deirdre Jones, he blurted out, "I told that bitch to keep her mouth shut, shit." During a search of Hollman's residence, a .38 caliber revolver was discovered. An expert testified at trial that the bullet that killed Ho could have come from that gun.

The jury convicted Hollman of second degree murder, possession of an instrument of crime, robbery, and criminal conspiracy.

After the trial, Hollman's counsel learned that, due to an apparent clerical error, the prosecution had not had, and thus did not provide him with, a full and accurate report of Dawkins's criminal history. This error was not detected until Dawkins was arrested for robbery several months after the Hollman trial. Dawkins had accidently been given

3

two different identification numbers in the police computer system. The record retrieved by the government and provided to defense counsel contained a recent arrest for burglary, a prior arrest under the alias John Johnson, and several open bench warrants. However, it did not contain significant aspects of Dawkins's criminal history including robbery and conspiracy convictions, and a prior conviction for filing a false report of incriminating evidence with the authorities.

Hollman moved for a new trial in state court arguing, inter alia, that the prosecution's failure to turn over this impeachment evidence constituted a Brady violation. See Brady v. Maryland, 373 U.S. 83 (1963).[1] Hollman contended that had the information been available during trial, the credibility of Dawkins could have been impeached using his prior crimen falsi convictions. The trial court held a post-trial hearing on the matter and then denied the motion, sentencing Hollman to life in prison. The Superior Court rejected the same argument and the Supreme Court of Pennsylvania denied an allowance of appeal. Hollman then filed this S 2254 motion in the district court on March 2, 1997. The district court, adopting the opinion of the Magistrate Judge, denied relief finding that the failure to produce Dawkins's entire criminal record did not warrant a new trial under Brady. As the district court granted a certificate of appealability, we have jurisdiction pursuant to 28 U.S.C. S 2253(a). We likewise deny Hollman's habeas petition.

Standard of Review

We exercise plenary review over a district court's legal conclusions made in reviewing a S 2254 petition. See Orban v. Vaughn, 123 F.3d 727, 729 (3d Cir. 1997), cert. denied, 118 S. Ct. 717 (1998). Because Hollman filed his petition before the district court on March 24, 1997, it is governed by the provisions of the Antiterrorism and Effective Death Penalty Act ("AEDPA") which became effective on April 24, 1996. The AEDPA creates the following standard that

_____

1. Hollman raised other issues in his state court motions but the appeal before us focuses on the alleged Brady violation.

4

federal courts must apply when reviewing a habeas petition brought by a state prisoner:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim--
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States, or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. S 2254(d). The issue raised in Hollman's habeas petition was clearly adjudicated on the merits in state court. Because the question before us is one of law we examine the state court's decision to determine if it was "contrary to, or involved an unreasonable application of clearly established federal law." As we find that the state court's decision on Hollman's petition was not deficient under this standard, we will deny habeas relief.

We recognize that we have not yet defined the contours of the new AEDPA standard. See Berryman v. Morton, 100 F.3d 1089, 1103 (3d Cir. 1996) (stating that "we have not determined the extent of the deference that federal habeas courts must afford to the legal or the factual determinations made by state courts").2 However, we need not do so here, because the Pennsylvania Superior Court did not render a decision contrary to clearly established federal law under any reading of the relevant standard.

_____

2. Cf. O'Brien v. DuBois, 145 F.3d 16 (1st Cir. 1998) (setting forth that circuit's interpretation of the AEDPA); Green v. French, 143 F.3d 865 (4th Cir. 1998) (same); Neelley v. Nagle, 138 F.3d 917 (11th Cir. 1998) (same); Drinkard v. Johnson, 97 F.3d 751 (5th Cir. 1996), cert. denied, 117 S. Ct. 1114 (1997) (same).

State Court's Determination

When the error regarding Dawkins's criminal identification numbers was discovered, Hollman moved for a new trial on the basis of the claimed Brady violation and argued that his counsel had been ineffective in failing to produce other evidence to impeach Dawkins. The trial court conducted a post-trial hearing. The court determined that the failure to produce Dawkins's entire criminal record did not constitute a Brady violation and that even if defense counsel had known about the earlier convictions, the result of the trial would not have been different. The trial court thus concluded that a new trial was not warranted. Hollman appealed to the Superior Court which determined that the mistakenly omitted evidence did not constitute a Brady violation, that Hollman was not entitled to a new trial on the basis of after-discovered evidence, and that the court's charge did not deny Hollman due process.3 The Supreme Court of Pennsylvania denied an allowance of appeal on April 1, 1996. As Hollman has exhausted his state court remedies with respect to the issues raised in this appeal, we can review his claim brought under S 2254.

Discussion

In Brady, the Supreme Court held that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or punishment." 373 U.S. at 87. A new trial will be granted for a Brady violation only if the defendant can demonstrate both that the prosecution withheld exculpatory evidence, and that the evidence was material, in that the defendant did not receive a fair trial because of its absence. See United States v. Pelullo, 105 F.3d 117, 122 (3d Cir. 1997). It is well established that
_____

3. Although the Superior Court decision that Brady was not violated rested on an erroneous view that impeachment material cannot constitute exculpatory evidence under Brady, the particulars of the reasoning do not affect our ruling because we hold that, in any event, the state court adjudication did not result in a decision that was contrary to, or an unreasonable application of, clearly established federal
law because we, too, find that Brady is not implicated.

6

impeachment evidence can constitute exculpatory evidence under Brady and its progeny and Hollman is correct that evidence of a government witness's prior criminal history is evidence which must be produced to the defense. See United States v. Bagley, 473 U.S. 667, 676 (1985); Giglio v. United States, 405 U.S. 150, 153 (1972).

The law is clear that the prosecution must not "withhold" impeachment evidence. It is equally clear that the government is only "obligated to produce certain evidence actually or constructively in its possession or accessible to it." United States v. Perdomo, 929 F.2d 967, 970 (3d Cir. 1991).4 Where the prosecutor had no actual or constructive possession of information, there can be no Brady violation for failure to disclose it. It is uncontested that the prosecution did not have actual possession of the full criminal record of Dawkins. Constructive possession means that a prosecutor "should . . . have known that the material at issue was in existence." United States v. Joseph, 996 F.2d 36, 39 (3d Cir. 1993).

In Perdomo, we found a Brady violation where the government failed to provide the defense with a witness's criminal history report. 929 F.2d at 971. In that case, however, the government's search for available information was deficient in that it failed even to request a criminal history report from the Virgin Islands. Id. It was the government's failure to seek "information readily available to it" which prompted the court to find that the first prong of Brady had been violated. Id. Thus, we, along with several other circuits have imposed upon the prosecution a duty to search accessible files to find requested exculpatory material. See United States v. Brooks, 966 F.2d 1500, 1502–03 (D.C. Cir. 1992); Carey v. Duckworth, 738 F.2d 875, 878

_____

4. By discussing Third Circuit caselaw construing Brady we are not concluding that it is necessarily pertinent, let alone controlling, in applying the standard under the AEDPA. There are conflicting views among the courts of appeals referenced above as to the relevance and weight of precedents established by courts other than the Supreme Court in applying the AEDPA, and we have yet to explore this issue. However, Perdomo is useful to demonstrate that even our court of appeals, in applying Brady, has not ventured from the concept that it is available and accessible information that must be disclosed.

7

(7th Cir. 1984); United States v. Auten, 632 F.2d 478, 481 (5th Cir. 1980). As one court has noted, the duty rests on the notion that "government failure to turn over an easily turned rock is essentially as offensive as one based on government non-disclosure." Brooks, 966 F.2d at 1503. The duty to search discourages the government from intentionally keeping itself ignorant of information useful to the defense. See Carey, 738 F.2d at 878. However, where the government has diligently searched, no Brady violation will be found. See United States v. Young, 20 F.3d 758, 764 (7th Cir. 1994) (declining to find Brady violation where government diligently searched national and localfiles for information about witness's criminal history but failed to search records of other states).

Here we cannot say that the prosecutor should have-- or even could have -- known about, or searched for, the clerical error which resulted in Andre Dawkins being given two different criminal identification numbers. The cause of the failure is characterized by the parties as an administrative mistake. Without some record evidence that it was something more than a mistake, we cannot conclude that the government withheld information that was readily available to it or constructively in its possession. Accordingly, we find that the government did not withhold Dawkins's full criminal history and that the failure of the government to produce this material does not constitute a Brady violation.

We note that Hollman is really arguing that we expand the scope of what constitutes Brady material, since he does not dwell on the issue of accessibility, but focuses, rather, on his view that the defendants' proceeding to trial without this type of information simply should constitute a violation of Brady. We have little difficulty rejecting this argument as it clearly entails extending Brady beyond the scope of any federal case precedent.

Even if we were to view the prosecution's failure to retrieve Dawkins's complete record as a violation of Brady, he would not be entitled to a new trial unless we determined that the favorable evidence was "material" in that Hollman did not receive a fair trial because of the absence of that evidence. See Pelullo, 105 F.3d at 122

(citations omitted). A fair trial is one deemed worthy of confidence. See Kyles v. Whitley, 514 U.S. 419, 434 (1995). The defendant must show that "the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." Id. at 435. The question here is whether Dawkins's crimen falsi convictions are material, that is, whether there is a reasonable probability that disclosure of his criminal record would have led to a different result at trial. Id. at 432–42.

Hollman asserts that the absence of a record of Dawkins's prior crimen falsi convictions was material and deprived him of a fair trial in three ways. First, Dawkins was able to perjure himself with impunity regarding his criminal history; second, the government relied on Dawkins's credibility in its closing; and third, the jury instructions given by the trial judge somehow buttressed the credibility of Dawkins's testimony. Like the district court, we disagree.

It should be noted at the outset that Dawkins's credibility was impeached repeatedly during the trial. The cross-examination of Dawkins focused on inconsistencies in his statements to the police and in his trial testimony.[5] During his cross-examination, defense counsel established that Dawkins had an extensive history of conflict with law enforcement which he blamed on police harassment. The jury was made aware of the fact that Dawkins had a criminal record.[6] In addition, Dawkins admitted that bench

_____

5. Dawkins admitted that when questioned by the police he had initially denied seeing the murder and lied in his statement to the police because he "didn't want to get involved." App. at 1359–62. He also admitted that he did not reveal his address to police officers but claimed to be living on the streets because he feared he would be considered a "snitch" for reporting what he saw. App. at 1337.

6. Defense counsel questioned Dawkins about his most recent burglary arrest, about his prior conviction for theft and on his use of an alias in connection with that arrest. He denied his involvement in the burglary and his use of an alias but admitted, "I have summaries. I have a burglary. I ain't been a saint all of my life." App. at 1267.

9

warrants had been issued for him in several "summary cases." App. at 1255.7

When Dawkins was questioned about his most recent arrest for burglary, he denied that he had committed the crime and complained of extensive harassment by the police. However, the arresting officer testified that at the time of his arrest Dawkins admitted to having committed the burglary and that he was able to describe the items removed from the apartment. App. at 1557-58. In addition, the detective told the jury that Dawkins asked for help in dealing with his crack cocaine addiction. App. at 1559. During his testimony, Dawkins had stated that he hadn't used drugs for years. App. at 1286.

Further, Dawkins admitted at trial that he had a history of mental problems. Specifically, Dawkins testified that he had spent seven months in a state mental institution because he "didn't know who [he] was." App. at 1285. He also stated that he was no longer taking his psychiatric medication and had not been taking the medication at the time he observed Ho's murder. App. at 1286. We conclude that the additional impeachment material contained in the complete criminal record would have been merely cumulative. We find that even had defense counsel been provided with Dawkins's crimen falsi convictions, the additional impeachment evidence would not have put the whole case in such a different light as to undermine our confidence in the verdict.

Hollman contends that the harm created by the purported Brady violation was exacerbated because Dawkins escaped challenge for his perjury on the stand.8 It

_____

7. In response to a question about outstanding bench warrants Dawkins replied,

> I had summary bench warrants. It's from the case I got a little -- it
> used to haunt me. I used to dream about it so much that I had an
> attitude constantly, so much of an attitude that if someone said
> something to me, I would tell them off. They would not leave me
> alone. They still don't leave me alone. . . . And I told off many a
> police officer, many a people, and they locked me up.

App. at 1255-56.

8. This perjury consisted of three instances where Dawkins denied having a criminal record. App. at 1267; 1268; 1272.

10

is true that Dawkins perjured himself by not revealing that he did have a criminal record but this does not give rise to separate rights under Brady. Further, we note that had all the parties had Dawkins's full criminal history, it is unlikely that he would have testified that he had no record. Rather, it appears that Dawkins was attempting to benefit from the clerical error which seemingly purged a portion of his criminal past.

Hollman's contention that the government, in its closing argument, relied on the credibility of Dawkins is similarly flawed. App. at 1686; 1689-90.9 To the contrary, the prosecutor did not place undue reliance on the credibility of Dawkins and, seemingly realizing his questionable credibility, advised the jury that there was sufficient evidence to convict Hollman without the testimony of Dawkins. App. at 1679. Finally, Hollman's argument that the jury instructions invited the jury to rely on the testimony of Dawkins is without merit. The trial judge gave standard jury instructions that would have been unaffected if Dawkins had been impeached using his crimen falsi convictions.

The record as a whole lends further support to the conclusion that there was sufficient evidence to convict Hollman without the testimony of Dawkins. Compelling evidence was provided by Deirdre Jones who was traveling in the car with Hollman that night. While the trial court properly instructed that her testimony was subject to scrutiny as a "corrupt and polluted source," her version of the events was corroborated by the other witnesses in the case. For example, two witnesses heard the shooting, saw two men fleeing, and supplied information about the white

_____

9. In the two passages cited by Hollman, the prosecutor asked the jury to decide if Dawkins was "shaken" on the stand. However, the passages, read in their entirety reveal that the prosecutor recognized that his witness was flawed. First, the prosecutor stated:"No, I won't apologize for Andre Dawkins because there's dignity in everything. I submit to you that you saw him on the stand. Was he articulate? Was he shaken on cross-examination?" App. at 1686. Later, he asked, "I say to you, in the examination of Andre Dawkins, was he shaken? And do you think less of Andre Dawkins because of what a detective said that had nothing to do with nothing? If so, it's your decision." App. at 1690.

11

vehicle. One was able to note that the license plate started with "YZA." Shortly after the crime, and within blocks of the crime scene, a police officer stopped Hollman driving a vehicle matching this description. The officer testified as to Hollman's anxious demeanor upon being searched. Upon being informed that Jones had provided a statement, Hollman exclaimed, "I told that bitch to keep her mouth shut, shit." Finally, the bullet which killed Ho came from a .38 caliber gun. A .38 caliber gun was found in Hollman's apartment.

Thus, we conclude that the Superior Court's decision that the failure of the government to provide the full criminal history of Andre Dawkins did not constitute a violation of Hollman's rights under Brady was not a decision that was contrary to or an unreasonable application of federal law.

For the foregoing reasons, we will affirm the district court's order of November 25, 1997, denying Hollman's petition for habeas corpus.

A True Copy:
Teste:

      Clerk of the United States Court of Appeals
      for the Third Circuit

12